No. 24-10230

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ALPHA PHI ALPHA FRATERNITY INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; JANICE STEWART,

*Plaintiffs-Appellants*,

*v.*

SECRETARY, STATE OF GEORGIA.

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of Georgia, No. 1:21-cv-5337 (Hon. Steve C. Jones)

## BRIEF FOR APPELLANTS

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
MAURA DOUGLAS
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
  GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

ARI J. SAVITZKY
SOPHIA LIN LAKIN
MING CHEUNG
CASEY SMITH
ACLU FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
Telephone: (212) 519-7836

*Counsel for Plaintiffs-Appellants Alpha Phi Alpha Fraternity, Inc. et al.*

May 3, 2024

ADDITIONAL COUNSEL ON INSIDE COVER

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

SONIKA R. DATA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1–26.1-3, Appellants *Alpha Phi Alpha, Inc., Sixth District of the African Methodist Episcopal Church, Eric T. Woods, Katie Bailey Glenn, Phil Brown, and Janice Stewart* identify all Counsel, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1.    ACLU Foundation, Inc., *Counsel for Plaintiffs-Appellants*;

2.    ACLU Foundation of Georgia, Inc., *Counsel for Plaintiffs-Appellants*;

3.    Adegbile, Debo P., *Counsel for Plaintiffs-Appellants*;

4.    Aiken, D'Ericka, *Counsel for Plaintiffs-Appellants*;

5.    Albert M. Pearson LLC, *Counsel for Amicus*;

6.    Allensworth, Robert M., *Attempted Amicus*;

7.    Alpha Phi Alpha, Inc., *Plaintiff-Appellant;*

8.    Arbuthnot, Jacqueline Faye, *Grant Plaintiff-Appellant*;

9.    Bokat-Lindell, Noah B., *Counsel for Intervenor*

10.   Boone, Robert, *Counsel for Plaintiffs-Appellants*;

11.   Bowles, Jasmine, *Amicus*;

12.   Boyle Jr., Donald P., *Counsel for Defendant-Appellee*;

13.   Brown, Phil, *Plaintiff-Appellant;*

14.   Brown, Theron, *Grant Plaintiff-Appellant*;

15.   Bush, Jacquelyn, *Grant Plaintiff-Appellant*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

16. Carr, Christopher, *Counsel for Defendant-Appellee*;

17. Calvo-Friedman, Jennesa, *Former Counsel for Plaintiffs-Appellants*;

18. Cheung, Ming, *Counsel for Plaintiffs-Appellants*;

19. Common Cause, *Amicus*;

20. Conner, Mary Nell, *Grant Plaintiff-Appellant*;

21. Crowell & Moring LLP, *Counsel for Amicus*;

22. Data, Sonika, *Counsel for Plaintiffs-Appellants*;

23. Davis, Alexander S., *Counsel for Amicus*;

24. Dechert LLP, *Counsel for Amicus*;

25. DiGiuseppe, Marisa A., *Counsel for Plaintiffs-Appellants*;

26. Dixit, Anuj, *Counsel for Plaintiffs-Appellants*;

27. Douglas, Maura, *Counsel for Plaintiffs-Appellants*;

28. Draper, Paul R., *Counsel for Defendant-Appellee*

29. Election Law Clinic at Harvard Law School, *Amicus*;

30. Elias Law Group LLP, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

31. Fair Districts GA, *Amicus*;

32. Flynn, Erin H., *Counsel for Intervenor*;

33. Ford, Christina Ashley, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

34. Freeman, Daniel J., *Counsel for Intervenor*;

35. GALEO Latino Community Development Fund, Inc., *Amicus*;

36. Garabadu, Rahul, *Former Counsel for Plaintiffs-Appellants*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

37. Geaghan-Breiner, Charlotte, *Counsel for Plaintiffs-Appellants*;

38. Genberg, Jack, *Counsel for Amicus*;

39. Georgia Coalition for the People's Agenda, *Amicus*;

40. Georgia Department of Law, *Counsel for Defendant-Appellee*;

41. Georgia State Conference of the NAACP, *Amicus*;

42. Glaze, Ojuan, *Pendergrass Plaintiff-Appellant*;

43. Glenn, Katie Bailey, *Plaintiff-Appellant;*

44. Grant, Annie Lois, *Grant Plaintiff-Appellant*;

45. Graves, Cheryl, *Amicus*;

46. Greenbaum, Jon, *Counsel for Amicus*;

47. Greenwood, Ruth M., *Counsel for Amicus*;

48. Harrison, Keith, *Counsel for Amicus*;

49. Hawley, Jonathan Patrick, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

50. Heard, Bradley E., *Counsel for Amicus*;

51. Heaven, Astor H.L., *Counsel for Amicus*;

52. Hennington, Elliott, *Pendergrass Plaintiff-Appellant*;

53. Hessel, Daniel J., *Counsel for Amicus*;

54. Houk, Julie M., *Counsel for Amicus*;

55. Howell, Quentin T., *Grant Plaintiff-Appellant*;

56. Isaacson, Cory, *Counsel for Plaintiffs-Appellants*;

57. Ivey, Marvis McDaniel, *Amicus*;

58. Jacoutot, Bryan Francis, *Counsel for Defendant-Appellee*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

59. Jackson, Toni Michelle, *Counsel for Amicus*;

60. James, Triana Arnold, *Grant and Pendergrass Plaintiff-Appellant*;

61. Jamieson, Nathan, *Counsel for Amicus*;

62. Jones, Michael Brandon, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

63. Jones, Steve C., *District Court Judge*;

64. Kastorf Law LLP, *Counsel for Amicus*;

65. Kastorf, Kurt, *Counsel for Amicus*;

66. Khanna, Abha, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

67. Kim, Eliot, *Counsel for Plaintiffs-Appellants*;

68. Kim, Taeyoung, *Counsel for Plaintiffs-Appellants*;

69. Krevolin & Horst LLC, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

70. Lakin, Sophia Lin, *Counsel for Plaintiffs-Appellants*;

71. LaRoss, Diane Festin, *Counsel for Defendant-Appellee*;

72. Lawyers' Committee for Civil Rights Under Law, *Counsel for Amicus*;

73. League of Women Voters of Georgia, *Amicus*;

74. Lee, Theresa J., *Counsel for Amicus*;

75. Lewis, Joyce Gist, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

76. Love-Olivo, Cassandra Nicole, *Counsel for Amicus*;

77. May, Caitlin Felt, *Counsel for Plaintiffs-Appellants*;

78. McGowan Charlene, *Former Counsel for Defendant-Appellee*;

No. 24-10230
*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

79.    Miller, Alex W., *Counsel for Plaintiffs-Appellants*;

80.    Miller, Kelsey A., *Former Counsel for Plaintiffs-Appellants*;

81.    Mitchell, Cassie, *Counsel for Plaintiffs-Appellants*;

82.    O'Donnell, Courtney, *Counsel for Amicus*;

83.    Osher, Daniel C., *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

84.    Paradise, Loree Anne, *Former Counsel for Defendant-Appellee*;

85.    Pearson, Albert Matthews, *Counsel for Amicus*;

86.    Pendergrass, Coakley, *Pendergrass Plaintiff-Appellant*;

87.    Perkins Coie LLP, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

88.    Perkins, Brianne, *Amicus*;

89.    Petrany, Stephen J., *Counsel for Defendant-Appellee*;

90.    Raffensperger, Bradford J., *Defendant-Appellee*;

91.    Reynolds, Garrett, *Grant Plaintiff-Appellant*;

92.    Richards, Roberts, *Pendergrass Plaintiff-Appellant*;

93.    Rollins-Boyd, David, *Counsel for Amicus*;

94.    Rosenberg, Ezra D., *Counsel for Amicus*;

95.    Rueckert, Jens, *Pendergrass Plaintiff-Appellant*;

96.    Ruiz Toro, Juan M., *Counsel for Plaintiffs-Appellants*;

97.    Rutahindurwa, Makeba, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

98.    Savitzky, Ari J., *Counsel for Plaintiffs-Appellants*;

99.    Shaw, Abigail, *Former Counsel for Plaintiffs-Appellants*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

100.   Sivaram, Anuradha, *Former Counsel for Plaintiffs-Appellants*;

101.   Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellant;*

102.   Solomon, Elbert, *Grant Plaintiff-Appellant*;

103.   Southern Poverty Law Center, *Counsel for Amicus*;

104.   Sparks, Adam M., *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

105.   Smith, Casey Katharine, *Counsel for Plaintiffs-Appellants*;

106.   Steiner, Neil, *Counsel for Amicus*;

107.   Stewart, Janice, *Plaintiff-Appellant;*

108.   Stewart, Michael Elliot; *Counsel for Intervenor*;

109.   Strickland, Frank B., *Counsel for Defendant-Appellee*;

110.   Sykes, Eunice, *Grant Plaintiff-Appellant*;

111.   Taylor English Duma LLP, *Counsel for Defendant-Appellee*;

112.   Thomas, Ursula, *Amicus*;

113.   Tolbert, Elroy, *Grant Plaintiff-Appellant*;

114.   Tsai, Denise, *Counsel for Plaintiffs-Appellants*;

115.   Tyson, Bryan P., *Counsel for Defendant-Appellee*;

116.   United States Department of Justice, *Intervenor*;

117.   Varghese, George P., *Counsel for Plaintiffs-Appellants*;

118.   Vaughan, Elizabeth Marie Wilson, *Former Counsel for Defendant-Appellee*;

119.   Weigel, Daniel H., *Counsel for Defendant-Appellee*;

120.   Webb, Bryan K., *Counsel for Defendant-Appellee*;

No. 24-10230
*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

121.  Weitzman, Samuel, *Former Counsel for Plaintiffs-Appellants*;

122.  Willard, Russell D., *Counsel for Defendant-Appellee*;

123.  Williams, Ayana, *Former Counsel for Plaintiffs-Appellants*;

124.  Williams, H. Benjamin, *Amicus*;

125.  Williams, Edward, *Former Counsel for Plaintiffs-Appellants*;

126.  Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Plaintiffs-Appellants*;

127.  Wimbish, Dexter, *Grant Plaintiff-Appellant*;

128.  Woods, Eric T., *Plaintiff-Appellant;*

129.  Young, Sean Jengwei, *Former Counsel for Plaintiffs-Appellants*;

130.  Zabel, Joseph D., *Former Counsel for Plaintiffs-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Plaintiffs-Appellants state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: May 3, 2024                    */s/ Ari J. Savitzky*
                                      ARI J. SAVITZKY
                                      *Counsel for Plaintiffs-Appellants*
                                      *Alpha Phi Alpha Fraternity, Inc. et al.*
                                      *(No. 24-10230)*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument, which may assist the Court in resolving the appeal given the extensive factual record.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ...................................................... C1

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ........................................................................... v

JURISDICTION ........................................................................................... vii

STATEMENT OF THE ISSUE ......................................................................... 1

INTRODUCTION .......................................................................................... 2

BACKGROUND ........................................................................................... 5

    A.    South Metro Atlanta And Other Areas See Massive Black Population Growth, But No Change In The Number Of Black-Majority Districts ...................................................... 5

    B.    Plaintiffs Prove Vote Dilution In South Metro Atlanta And Other Areas At Trial .............................................................. 6

    C.    The 2023 Remedial Plans Create No New Opportunities For Black Voters In South Metro Atlanta And Other Areas ................................................................................. 17

    D.    The District Court Overrules Plaintiffs' Objections ............. 27

LEGAL STANDARD ...................................................................................... 29

SUMMARY OF ARGUMENT ......................................................................... 30

ARGUMENT ................................................................................................. 32

I.    IN THE ABSENCE OF NEW POLITICAL OPPORTUNITIES, NEWLY NUMBERED DISTRICTS ARE NOT A COMPLETE REMEDY FOR VOTE DILUTION ....................................................................... 32

    A.    A Section 2 Remedy Must Provide Injured Voters With New Opportunities For Minority Voters To Elect Candidates Of Their Choice ............................................... 32

    B.    The 2023 Remedial Plans Do Not Provide Injured Black Voters In South Metro Atlanta With New Opportunities To Elect Candidates Of Choice ............................................. 37

II.    THE DISTRICT COURT FAILED TO CONSIDER IMPORTANT, UNDISPUTED EVIDENCE AND ABUSED ITS DISCRETION ................. 43

CONCLUSION ....................................................................................................52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Allen v. Milligan*, 599 U.S. 1 (2023)....................................................7, 33

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) ............................48

*Cooper v. Harris*, 581 U.S. 285 (2017) ...................................12

*Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir. 1987)........3, 4, 30, 32, 36, 43

*Ford v. Brown*, 319 F.3d 1302 (11th Cir. 2003).......................................51

*Georgia State Conference of NAACP v. Fayette County Board of
    Commissioners*, 775 F.3d 1336 (11th Cir. 2015) ...................................30, 47

*Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755
    (11th Cir. 1996) .......................................................29, 30

*Holder v. Hall*, 512 U.S. 874 (1994) ......................................................48

*James River Insurance Co. v. Rich Bon Corp.*, 34 F.4th 1054
    (11th Cir. 2022) .........................................................50

*League of United Latin American Citizens v. Perry*, 548 U.S. 399
    (2006)....................................................................33, 50

*Mississippi State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400
    (5th Cir. 1991) ............................................................32

*Perry v. Perez*, 565 U.S. 388 (2012) (*per curiam*) ....................................36

*Shaw v. Hunt*, 517 U.S. 899 (1996) ..................................28, 33, 34, 35, 37

*Singleton v. Allen*, 2023 WL 5691156 (N.D. Ala. Sept. 5, 2023) ....................30, 33

*Thomas v. Bryant*, 919 F.3d 298 (5th Cir. 2019).....................................29

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................12

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) (*en banc*) ................30, 43

v

*United States v. Dallas County Commission, Dallas County, Alabama*,
  850 F.2d 1433 (11th Cir. 1988) .........................................................31, 35, 36

*Wise v. Lipscomb*, 437 U.S. 535 (1978).................................................36

*Wright v. Sumter County Board of Elections & Registration*, 979 F.3d
  1282 (11th Cir. 2020) .......................................................30, 47, 49

## DOCKETED CASES

*Alpha Phi Alpha Fraternity, Inc. v. Secretary, State of Georgia*,
  No. 23-13914 (N.D. Ga.) ................................................................16

*Grant v. Raffensperger*, No. 22-cv-00122 (N.D. Ga.)..............................7

*Pendergrass v. Raffensperger*, No. 21-cv-05339 (N.D. Ga.) ....................7

## STATUTORY PROVISIONS

42 U.S.C. § 1973 .............................................................................34

52 U.S.C. § 10301 ...........................................................................33

## OTHER AUTHORITIES

Georgia General Assembly, HB1EX: Georgia House of
  Representatives Redistricting Act of 2023, https://
  www.legis.ga.gov/legislation/65850 ............................................17

Georgia General Assembly, SB1EX: Georgia Senate Redistricting Act
  of 2023, https://www.legis.ga.gov/legislation/65851 ....................17

Nolan, Jill, *Georgia special legislative session on tap for the holidays
  after judge tosses political maps*, Georgia Recorder (Oct. 27,
  2023), https://georgiarecorder.com/2023/10/27/georgia-special-
  legislative-session-on-tap-for-the-holidays-after-judge-tosses-
  political-maps/ ...........................................................................17

S. Rep. No. 97-417 (1982) ...............................................................31

## JURISDICTION

Plaintiffs-Appellants brought suit under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and 42 U.S.C. § 1983. The district court had subject matter jurisdiction under 28 U.S.C. § 1331. Plaintiffs-Appellants timely filed their notice of appeal on January 22, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether, having found violations of Section 2 of the Voting Rights Act in specific geographic areas of Georgia, the district court erred in approving remedial maps that did not provide any additional opportunities to elect candidates of choice for Black voters in those specific geographic areas.

## INTRODUCTION

After an eight-day bench trial, the district court found that Georgia's 2021 State Senate and House redistricting plans violated Section 2 of the Voting Rights Act in particular parts of South and West Metro Atlanta and the Macon-Bibb area. But the district court then failed, at the remedy phase, to order into place new plans that remedy the harms suffered by Black voters in those specific areas. That was legal error and this Court should reverse.

The district court's liability decision following trial ordered the State to add two additional Black-majority Senate districts and two additional Black-majority House districts in South Metro Atlanta, along with one additional Black-majority House district in West Metro Atlanta, in order to remedy vote dilution in those areas. In response, the General Assembly enacted new Senate and House Plans (the "2023 Remedial Plans"). Those plans increased the overall, statewide number of Black-majority districts in Georgia. But they did so by adding tens of thousands of Black voters to Black-majority districts in areas like North Metro Atlanta *that were not at issue in this case*. In contrast, the 2023 Remedial Plans changed nothing about the political opportunities for Black voters *in the South Metro Atlanta area where vote dilution was proven*.

In the areas where the court found unlawful vote dilution and ordered relief—chief among them South Metro Atlanta—the 2023 Remedial Plans merely shuffled

2

the lines of the existing Black-majority districts and changed the numbering of some of those districts, creating the superficial appearance of "new" districts. But the number of Black *voters* in South Metro Atlanta who live and vote in Black-majority districts is essentially unchanged. Most starkly, the 2023 Remedial Senate Plan increased the number of Black voters in Black-majority districts in South Metro Atlanta by a net of only 3,000 total voters. For comparison, the population of two State Senate districts is *380,000*. As Plaintiffs demonstrated with hundreds of pages of uncontested analysis, numerous cities, towns, and entire counties that were at the heart of the case saw no change in the opportunities for Black voters to elect their candidates of choice. In North Metro Atlanta, by contrast, around 95,000 Black voters were newly added to Black-majority Senate districts, such that Black voters gained new influence in areas that are totally irrelevant to the case and that were not the subject of trial.

This type of shell game is not a valid remedy. Once a Section 2 violation has been found, a new plan must be put in place that will "*completely* remedy the Section 2 violation" and "*fully* provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 250, 252-253 (11th Cir. 1987). And because the right to an undiluted vote belongs to particular voters—not to minority groups writ large—settled precedent and fundamental equity principles require that a Section 2 remedy in fact benefit the

particular voters whose rights were violated, *i.e.*, the minority voters in the local areas where vote dilution was proven.  A districting plan that circumvents these principles, by shuffling around other Black voters in other areas in order to create the illusion of new opportunities, does not abate the unlawfulness of the challenged plans or the necessarily localized harms they cause.

The district court thus erred in accepting the 2023 Remedial Plans as a valid remedy for vote dilution in South Metro Atlanta even though the political opportunities for Black voters in South Metro Atlanta are unchanged.  And it abused its discretion in failing to consider Plaintiffs' evidence demonstrating this lack of new political opportunities for those voters.  The court deemed merely renumbered Black-majority districts to be "new," conducted no inquiry into these districts' effects on South Metro Atlanta Black voters' opportunities to elect candidates of choice, and accordingly accepted a remedial plan that fails to provide injured voters with new opportunities to elect preferred candidates, as controlling law requires.

Nor can the district court's conclusion be justified by "deference" to the General Assembly.  Courts may not defer to a plan that fails to "*completely* remedy the Section 2 violation."  *E.g.*, *Dillard*, 831 F.2d at 252-253.  The 2023 Remedial Plans merely shift voters *between* existing Black-majority districts, without creating new opportunities in areas where vote dilution was proven.  They do not remedy vote dilution in those areas and are not a valid remedy.  This Court should reverse.

4

## BACKGROUND

**A.    South Metro Atlanta And Other Areas See Massive Black Population Growth, But No Change In The Number Of Black-Majority Districts**

Georgia's Black population has grown massively over the last 20 years. Between 2000 to 2020, the number of Black Georgians increased by over 1.1 million, a nearly 50% increase equal to the population of six State Senate districts or more than 19 State House districts.  Doc. 333 ("Merits Op.") at 32-34.[1]  Over the last decade alone, Georgia's Black population increased by nearly 500,000, while the White population declined.  Merits Op. 33-34.  This growth was especially explosive in the Metro Atlanta region, where the Black population increased by over 900,000 people between 2000 and 2020, and over 400,000 in the last decade alone. Merits Op. 34-37.  Counties in South Metro Atlanta saw some of the highest rates of change.  In particular, the five-county region that Plaintiffs focused on at trial— comprised of Fayette, Spalding, Henry, Newton, and Rockdale Counties— experienced nearly 300% Black population growth over the last two decades.  Merits Op. 36-37.  Fayette and Spalding Counties experienced a 54.5% increase in their Black population from 2010 to 2020.  *Id.*  Henry County's Black population,

---

[1]    As used herein, "Black" refers to persons who are any-part Black, *i.e.*, single-race Black or of two or more races and some part Black.  Merits Op. 32 n.14.

meanwhile, increased by 39.3% in the last decade—turning a county that in the 1990s was not even "10 percent Black" into a plurality Black county.  *Id.* at 37.

While the Black population in South Metro Atlanta grew, the number of Black-majority districts in South Metro Atlanta—and in Georgia generally—remained stagnant.  Most glaringly, the 2021 Enacted Senate Plan had the same number of Black-majority districts as the previously operative 2014 Senate Plan, and the 2021 Enacted House Plan had just two more Black-majority districts than the previously operative 2015 House Plan.  Indeed, little had changed in decades:  The 2021 Enacted Senate Plan had only one more Black-majority district than the 2006 Senate Plan, and the 2021 Enacted House Plan had just four more Black-majority districts than the 2006 House Plan.

## B.    Plaintiffs Prove Vote Dilution In South Metro Atlanta And Other Areas At Trial

Plaintiffs challenged the 2021 Enacted Senate and House Plans under Section 2 of the Voting Rights Act.  Plaintiffs argued that the maps unlawfully diluted the votes of Black Georgians in South Metro Atlanta, the Macon-Bibb area, Southwest Georgia and Eastern Georgia.  *See* Doc. Nos. 1 & 26.  Following extensive discovery, a consolidated trial of this case and other parallel actions[2] took place from

---

[2]    A separate set of plaintiffs also challenged the state legislative maps in *Grant v. Raffensperger*, claiming Georgia's 2021 Enacted Senate and House Plans violated Section 2 in parts of south and west Metro Atlanta, the Macon-Bibb area and Eastern

September 5, 2023 to September 14, 2023.  On October 26, 2023, the court concluded that Plaintiffs had carried their burden with respect to some of the areas at issue, demonstrating that the challenged redistricting plans diluted the voting strength of Black voters in violation of Section 2 of the VRA in, among other areas, South Metro Atlanta.  Merits Op. 514.

As relevant here, and consistent with the preconditions set forth in *Thornburg v. Gingles* and its progeny, *e.g.*, *Allen v. Milligan*, 599 U.S. 1 (2023), the court made detailed findings about the specific areas where Plaintiffs were granted relief.

The court first credited the testimony of Plaintiffs' demographic and mapping expert, Mr. William Cooper.  Mr. Cooper drew illustrative legislative plans (the "Illustrative Plans") demonstrating that additional, reasonably-configured Black-majority Senate and House districts could be added in the areas of focus, including in the South Metro Atlanta area—bringing many tens of thousands of Black voters in places like Fayette County, Spalding County, Henry County, and Newton County into those districts.  Merits Op. 287.  Mr. Cooper's additional Black-majority Senate Districts in the South Metro area, which were a primary focus of the trial, are depicted below, along with the 2021 Enacted Plans in the same area, with districts

---

Georgia.  No. 22-cv-00122 (N.D. Ga.). A third set of plaintiffs challenged Georgia's congressional districts in *Pendergrass v. Raffensperger*, alleging Georgia's 2021 Congressional Plan violated Section 2 in parts of west Metro Atlanta.  No. 21-cv-05339 (N.D. Ga.).

shaded in different colors, counties labeled in block lettering and separated a dashed line, and Black-majority districts labeled in green.[3]

### 2021 Enacted Senate Plan (South Metro Atlanta)



Doc. 357-3 at 294.

---

[3]    For example, 2021 Enacted Senate District 10 is a Black majority district depicted in purple.  It includes south Dekalb County and west Henry County.  By contrast, 2021 Enacted Senate District 16 is not a Black majority district and is depicted in pink.  It begins in Fayette County, and then runs down through Spalding to Pike and Lamar Counties.

Cities are also labeled in the images, and their municipal boundaries overlayed as a semi-transparent layer on top of the districts.  For example, in the 2021 Enacted Senate Plan, Fayetteville, located in Fayette County, is split between 2021 Enacted Senate Districts 34 and 16.

Region A, the solid blue line, outlines the five-county region that Plaintiffs focused on at trial—comprised of Fayette, Spalding, Henry, Newton, and Rockdale Counties. 2021 Senate Districts ("SDs") 16 and 17—White-majority districts in Region A that are labeled in black in the above map—were the main focus of Plaintiffs' case at trial, as discussed in further detail below. *See infra* pp. 10-11.

**Plaintiffs' Illustrative Senate Plan (South Metro Atlanta)**



Doc. 357-3 at 296.

As shown above, Mr. Cooper's plans (which identified the areas where vote dilution was proven) added Black-majority districts *in the South Metro Atlanta area*

*in particular*.  They thus provided new opportunities for Black voters in South Metro Atlanta who had been placed in White-majority districts under the 2021 Enacted Plan.  For example, 2021 Enacted SD 17 reached out from the diverse, booming Atlanta suburbs in Henry County all the way to rural and heavily White Morgan and Walton Counties, in a shape that the State's own mapper Gina Wright conceded was "jagged."  Doc. 245 at 12.  In contrast, Mr. Cooper's Illustrative SD 17, shaded in orange above, which was a new Black-majority district, grouped together nearby suburban areas in Henry, Rockdale, and south Dekalb County that share socioeconomic commonalities and other ties, in a smaller, more compact district.  *E.g.*, Merits Op. 279-287; Doc. 325 at Tr. 117:5-11; Doc. 383 at Tr. 231:1-20; Doc. 329 at Tr. 1306:23-25; Doc. 318 ¶¶ 248, 249.  Similarly, 2021 Enacted SD 16 stretched for 50 miles to unite very different communities, connecting communities in suburban Atlanta such as Fayetteville with rural and heavily White areas that are socioeconomically distinct.  *See* Doc. 357-1 at 40-41.  By contrast, Mr. Cooper's Illustrative SD 28 in the same area, which is a new Black-majority district, was half the length (24 miles) and connected adjacent South Metro suburban and exurban communities in south Clayton, Fayette, and Spalding Counties that are geographically close and share socioeconomic characteristics.  Merits Op. 287-295; Doc. 329 at Tr. 1302:9-11, 1309:25-1310:9; Doc. 330 at Tr. 1685:2-20.

The specific characteristics of the South Metro Atlanta communities included in these districts were a critical part of Plaintiffs' trial case, and the subject of hours of trial testimony.  As part of their case, Plaintiffs introduced evidence and testimony from both Mr. Cooper and fact witnesses discussing the communities in South Metro area in detail in order to prove that reasonably configured Black-majority districts could be drawn in that specific areas.  The testimony from Mr. Cooper as well as Henry County resident Sherman Lofton touched on travel times and local transportation routes between different South Metro area communities, *e.g.*, Doc. 383 at Tr. 231:17-20, Doc. 329 at Tr. 1308:16-22, school sports competitions and rivalries between South Metro area schools, *e.g.*, Doc. 329 at Tr. 1306:23-25, patterns of commerce at local South Metro shopping centers, like Tanger Outlets in Locust Grove in south Henry County, *id*. at Tr. 1302:9-11, 1308:23-1309:8, and other common characteristics in these diversifying suburban areas, *e.g.*, Merits Op. 284-287, 292-295, 300-301, 306-308; Doc. 325 at Tr. 113:6-114:18, Tr. 116:6-8; Doc. 383 at Tr. 231:14–20; Doc. 330 at Tr. 1685:2-20; Doc. 357-1 ¶¶ 127-128. There was no similar testimony regarding the North Metro Atlanta area.

With respect to the second and third *Gingles* preconditions, which require proof of racially polarized voting in the areas of focus, Plaintiffs' evidence again

was carefully tailored to specific areas, chief among them South Metro Atlanta.[4]  In finding that Plaintiffs had met their burden, the district court credited the expert report and in-court testimony of Plaintiffs' expert Dr. Lisa Handley.  Merits Op. 73-75, 419-420.  Dr. Handley analyzed polarized voting patterns in clusters of counties corresponding with legislative districts in the South Metro Atlanta area along with other geographic areas of focus.  The South Metro Atlanta Senate District clusters that Dr. Handley analyzed, one of which included 2021 Enacted SD 17 and one of which included 2021 Enacted SD 16, are depicted below with Black-majority districts in red.  From her region-specific analysis, Dr. Handley concluded that voting was "starkly racially polarized" in each of the assessed clusters.  *See* Doc. 385 at Tr. 862:4-6; Merits Op. 411, 419-420 (crediting Dr. Handley's analysis and finding polarization requirements satisfied).  Dr. Handley did not perform such an analysis with respect to North Metro Atlanta, where Plaintiffs had not claimed that vote dilution was occurring.

---

[4]     Plaintiffs tailored their racially polarized voting analysis in this way because that is what the *Gingles* standard requires.  *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 59 n.28 (1986) (inquiry into "racially polarized voting" must be "district specific"); *see also, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 304 n.5 (2017) (noting that general statewide conclusions of racially polarized voting fails to "address the relevant local question: whether, in a new version of [the district] created without a focus on race, black voters would encounter sufficient white bloc-voting to cancel their ability to elect representatives of their choice[.]" (cleaned up)).

**South Metro Area Senate District Cluster: 2021 SDs 10, 17, and 43**



Doc. 357-12 at 17.

**South Metro Area Senate District Cluster: 2021 SDs 16, 28, 34, and 44**



Doc. 357-12 at 19.

Dr. Handley's racially polarized voting analysis thus focused on voting patterns in the particular areas being challenged, especially in South Metro Atlanta. She demonstrated, for example, that during the 2022 general elections, 97.6% of Black voters in 2021 Enacted SD 17 supported the Black-preferred candidate while 96.6% of White voters supported the White-preferred candidate. Doc. 357-12 at 56. The White-preferred candidate during the 2022 state general election consequently defeated the Black-preferred candidate with 61.6% of the vote. *Id.* at 18, 56. In 2021 Enacted House District ("HD") 74 during the same general election, 89% of Black voters supported the Black-preferred candidate while 92.3% of White voters supported their White-preferred candidate. *Id.* at 58. Again, the White-preferred candidate defeated the Black-preferred candidate, with 63.7% of the vote. *Id.* at 24. Dr. Handley conducted this district-specific, functional analysis for each of the 2021 Enacted districts and the corresponding Illustrative Districts in each of her clusters, including in South Metro Atlanta. *Id.* at 17-31, 56-62. But she did not conduct a similar analysis for North Metro Atlanta.

Based on the trial record, the district court concluded that Plaintiffs had met their burden with respect to the *Gingles* preconditions. That is, Plaintiffs showed that, in specific areas like South Metro Atlanta, additional, reasonably-configured Black-majority districts could be drawn, but absent such districts, Black voters would be shut out of power and rendered unable to elect candidates of choice due to

persistent White bloc voting against Black-preferred candidates.  *See* Merits Op. 426 (finding that Plaintiffs proved all three *Gingles* preconditions).  The district court also found that Plaintiffs had met their burden to show that, on the totality of circumstances, state legislative elections in the areas of focus, like South Metro Atlanta, were not equally open to Black voters.  Merits Op. 429, 480-481.  In addition to proving stark patterns of racially polarized voting in those areas, Plaintiffs provided "concrete recent examples of the discriminatory impact of recent Georgia practices, some specifically in the area of the districts proposed."  Merits Op. 449-450.  Plaintiffs also showed that "Black voters have lower voter turnout rates than white voters," "that Black Georgians suffer from significant socioeconomic disparities," Merits Op. 482 n.124, 462-465, and that these socioeconomic disparities affect Black Georgians' ability to participate in the political process, Doc. 386 at Tr. 1054:22-1055:20; Doc. 328 at Tr. 1100:18-25.

Having found vote dilution violations in South Metro Atlanta and other specific areas, *see* Merits Op. 480-481, the district court ordered that additional Black-majority districts be drawn in those areas.  Consistent with its liability findings, the court specified that the remedy must include "two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around

Macon-Bibb." Merits Op. 509. The district court then delineated the specific geographic area where illegal vote dilution was occurring, and where district boundaries would need to be changed in order to add additional Black-majority districts: 2021 Enacted SDs 10, 16, 17, 25, 28, 30, 34, 35 43, and 44 and 2021 Enacted HDs 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149. *Id*. at 514.

The South Metro Atlanta portion of this area is marked with gray shading on the map below, which represents the above-referenced Senate Districts:



Doc. 356-2 at 1.

The district court then afforded the General Assembly an opportunity to enact VRA-compliant maps consistent with its decision. *Id.*[5]

---

[5]    The Secretary has separately appealed the district court's decision that Georgia's 2021 Redistricting Plans violated Section 2 in parts of south and west Metro Atlanta and the Macon-Bibb area. *See* Case No. 23-13914.

16

**C.    The 2023 Remedial Plans Create No New Opportunities For Black Voters In South Metro Atlanta And Other Areas**

Following the district court's decision, Governor Brian Kemp called the General Assembly into a special legislative session. The General Assembly quickly passed the 2023 Remedial Senate and House Plans into law.[6]

Plaintiffs timely filed objections in the district court and submitted hundreds of pages of evidence, including an expert report from Mr. Cooper, illustrating the inadequacy of the 2023 Remedial Plans. In particular, Plaintiffs demonstrated that those plans created virtually no new opportunities for Black voters in the relevant vote-dilution areas, especially in South Metro Atlanta. Rather, as set forth below, the 2023 Remedial Plans left numerous districts in the heart of the South Metro Atlanta vote-dilution area untouched, while making massive changes outside of the vote-dilution area in order to generate an overall increase in Black-majority districts.

With respect to the Senate, the map below, which was submitted at the remedial hearing, overlays the 2021 Enacted Senate Plan (black lines) and the 2023 Remedial Plan (gold lines) in the South Metro Atlanta area, showing the Black-

---

[6]    *See* Nolan, *Georgia special legislative session on tap for the holidays after judge tosses political maps*, Georgia Recorder (Oct. 27, 2023), https://georgia recorder.com/2023/10/27/georgia-special-legislative-session-on-tap-for-the-holi days-after-judge-tosses-political-maps/; Georgia General Assembly, SB1EX: Georgia Senate Redistricting Act of 2023, https://www.legis.ga.gov/legislation/ 65851; Georgia General Assembly, HB1EX: Georgia House of Representatives Redistricting Act of 2023, https://www.legis.ga.gov/legislation/65850.

majority districts in both plans.  Purple areas are in Black-majority districts in both plans (*i.e.*, voters in these districts were previously in a Black-majority district and are again in one in the Remedial Senate Plan).  For voters in those purple areas, the lines and district numbers may have changed, but the political opportunities for Black voters have not.  Red areas are newly added into Black-majority districts.  Blue areas have been removed from Black-majority districts in the 2023 Remedial Senate Plan.  The South Metro Atlanta vote-dilution area (*i.e.*, the Senate Districts identified in the district court's liability decision) is shaded gray.[7]  As seen in the map, most of the new areas added to Black-majority districts (the areas in red) are in North Metro Atlanta, in densely populated parts of Cobb and North Fulton and North Dekalb Counties, areas not at issue at trial and where there was no proof of vote dilution presented.  By contrast, the five-county Fayette, Spalding, Henry, Newton, and Rockdale area—the area that experienced nearly 300% Black population growth over the last two decades, and where Plaintiffs focused on and proved vote-dilution at trial, Merits Op. 36-37; 514—remains almost entirely unchanged.

---

[7]    Because the 2023 Remedial Plans had not been adopted when the below maps were submitted as part of Mr. Cooper's report, the legend in the maps below, Doc. 356-2 at 3 and Doc. 356-2 at 14, 15, refers to the state's remedy as "Proposed Districts" and the 2021 Enacted Plan as the "Enacted Districts."



Doc. 356-2 at 3.

In Fayette and Spalding Counties, the situation for Black Georgians did not change at all. SD 16, which covers those areas, is identical in both plans. The increase of Black voters in Black-majority Senate Districts in Fayette County is accordingly *zero*: 13,117 Black voters lived in Black-majority districts under the 2021 Senate Plan, and under the 2023 Remedial Senate Plan, that number remained at 13,117. Doc. 356-3 at 1. In Spalding County, no Black voters lived in Black-majority districts under the 2021 Plan, and that number remained zero under the 2023 Remedial Senate Plan. *Id.* 2023 Remedial SD 16 still splits Fayetteville and the significant populations of Black Georgians in northeast Fayette County, and then runs down through Spalding to heavily White Pike and Lamar Counties, exactly as it did before. *See* Doc. 356-2 at 3; *supra* p. 10; *infra* p. 44. The trial evidence

showed, and the district court found, that this same configuration of the map diluted the voting strength of Black Georgians in Fayette and Spalding Counties.  Merits Op. 277-309, 408-413, 417-420, 429-480; Doc. 357-3 at 294; Doc. 357-12 at 17.

Similarly, the Remedial Senate Plan adds no new political opportunities for Black voters in the other South Metro counties, like Henry and Newton Counties. 2021 Enacted SD 17, which covered those counties, was renumbered to Remedial SD 42 but changed only slightly in its configuration.  The district still runs from the City of McDonough and surrounding areas of southern Henry County, through the southern half of Newton County, to more White and rural Walton and Morgan Counties, Doc. 356-3 at 1—a configuration that the district court found based on the trial evidence resulted in vote dilution, Merits Op. 512.  In Henry County, the number of Black voters residing in Black-majority Senate districts increased by about 20,000 under the Remedial Senate Plan, but this was offset by more than 17,000 South Metro area Black voters simultaneously *removed* from a Black-majority Senate district in neighboring Newton County.  Doc. 356-3 at 1.  Along with its geographic configuration, the BVAP (Black voting age population) of 2023 Remedial SD 42 is almost identical to 2021 Enacted SD 17.[8]

---

[8]    34.41% for 2023 Remedial SD 42 compared to 33.82% for 2021 Enacted SD 17.  Moreover, as Mr. Cooper's core constituency report showed, the population of the districts is over 76% the same.

Overall, the Remedial Senate Plan added a net of just *3,000* new Black voters from South Metro Atlanta (*i.e.*, counties like Fayette, Spalding, Newton, and Henry) into Black-majority districts. Doc. 356-3 at 1. The population of two Georgia Senate districts is around 380,000. Doc. 280 ¶ 277; *see also* Doc. 357-1 at 9 n.6. A net increase of 3,000 Black voters is mathematically insufficient to bring any one (let alone any two) of the non-Black-majority South Metro Atlanta Senate districts in the 2021 Enacted Senate Plan above a 50% BVAP. Doc. 280 ¶ 277; Doc. 357-1 at 9 n.6; Doc. 356-3 at 1.

By contrast, outside of the South Metro Area, and as set out in the below chart (and was also submitted at the remedial hearing), the situation for Black voters did change. In North Metro Atlanta areas where no vote dilution was alleged or found, almost *100,000* Black voters were newly moved into Black-majority districts. Doc. 356-3 at 1; *see also* Doc. 356-7 at 3-4.

**County Level Population Change (Senate)**

| County | Enacted Majority-Black BVAP | Proposed Remedial Majority-Black BVAP | Plaintiff Remedial Majority-Black BVAP | Proposed - Enacted Difference | Plaintiff - Enacted Difference | Enacted Majority-Black Total Pop | Proposed Remedial Majority-Black Total Pop | Plaintiff Remedial Majority-Black Total Pop | Proposed - Enacted Difference | Plaintiff - Enacted Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| Cobb | 35,736 | 65,681 | 35,736 | 29,945 | 0 | 108,305 | 200,482 | 108,305 | 92,177 | 0 |
| DeKalb | 244,949 | 292,332 | 244,949 | 47,383 | 0 | 408,445 | 599,385 | 408,445 | 190,940 | 0 |
| Douglas | 39,960 | 36,625 | 44,679 | -3,335 | 4,719 | 94,894 | 87,159 | 120,783 | -7,735 | 25,889 |
| Fayette | 13,117 | 13,117 | 23,728 | 0 | 10,611 | 32,060 | 32,060 | 119,194 | 0 | 87,134 |
| Fulton | 302,770 | 323,477 | 305,305 | 20,707 | 2,535 | 566,577 | 672,692 | 573,540 | 106,115 | 6,963 |
| Henry | 49,730 | 71,116 | 89,657 | 21,386 | 39,927 | 116,992 | 165,213 | 240,712 | 48,221 | 123,720 |
| Newton | 29,759 | 12,113 | 36,955 | -17,646 | 7,196 | 66,947 | 21,871 | 89,408 | -45,076 | 22,461 |
| Spalding | 0 | 0 | 17,511 | 0 | 17,511 | 0 | 0 | 67,306 | 0 | 67,306 |
| Walton | 0 | 0 | 5,536 | 0 | 5,536 | 0 | 0 | 44,590 | 0 | 44,590 |

Doc. 356-3 at 1.[9]  Plaintiffs' evidence showed, and it was undisputed at the remedial hearing, that the addition of these tens of thousands of Black voters to Black-majority districts in Cobb, North Fulton, and North Dekalb Counties, where vote dilution was not claimed or proven, caused the overall increase in the number of Black-majority Senate districts in the 2023 Remedial Plans.  *E.g.*, Doc. 354-1 ¶ 14.

At the remedial hearing, the Secretary claimed that there were "new" Black-majority districts in South Metro Atlanta based on the reconfiguration of existing

---

[9]    Because the 2023 Remedial Plans had not been adopted when Mr. Cooper submitted his report, the columns in Doc. 356-3 at 1 and Doc. 356-3 at 2 refer to the state's remedy as "Proposed Remedial" and the 2021 Enacted Plan as "Enacted."  At the time, Plaintiffs had also proposed their own remedial plan, which is referred to as "Plaintiff Remedial."

Black-majority districts in South Metro Atlanta (*i.e.*, in the purple areas in the map at *supra* p. 19).  For example, the 2023 Remedial Senate Plan includes a newly numbered Black-majority district in Henry and South Clayton Counties—2023 Remedial SD 17—but the vast majority of the *voters* in that district were already in 2021 Enacted SDs 10 and 44, which were existing Black-majority districts that covered parts of South Clayton, Henry and South Dekalb Counties.  Portions of those districts were repurposed as 2023 Remedial SD 17, while the other parts were extended northward, into North DeKalb County, an area previously covered by White-majority 2021 Enacted SD 42 that was not the subject of trial.  Doc. 356-2 at 3; Merits Op. 514.[10]  Tens of thousands of Black voters in North Dekalb County were added to Black-majority districts as a result.

Remedial SD 28, the other "new" Black-majority district in the Remedial Senate Plan, was similarly created by redrawing the lines of existing Black-majority Senate districts and combining them with North Metro Atlanta areas such as Cobb and North Fulton Counties where vote dilution was not claimed or proven, but where Black voters will now be included in Black-majority districts.  Doc. 356-2 at 3; Doc. 356-3 at 1.

---

[10]    Over 75% of 2021 Enacted SD 42 is parceled into Remedial SD 10 (60,000 voters) and SD 44 (77,000).  Nearly 50,000 Black voters who were in 2021 Enacted SD 42 were added to Black-majority Remedial SD 10 (27,000 voters) and SD 44 (21,000 voters).

The 2023 Remedial House Plan treats Black voters in South Metro Atlanta in a similar fashion.  In the area around Remedial HDs 74 and 117, the ostensibly "new" Black-majority districts, portions of Henry County were added to Black-majority districts (in red) but other portions of central Henry County and Newton County (in blue) that had previously been included were removed.



Doc. 356-2 at 15.

Across the South Metro Atlanta vote-dilution area, a net of 15,747 Black voters were added to Black-majority House districts.  Doc. 354-1 ¶ 42.  The population of two Georgia House districts is around 120,000.  Doc. 280 ¶ 278; *see also* Doc. 357-1 at 9 n.6.  A net increase of less than 16,000 Black voters is mathematically insufficient to bring any two of the non-Black-majority South Metro Atlanta House districts in the 2021 Enacted House Plan above 50% BVAP.  Doc.

24

354-1 ¶ 42.  Similarly, in Western Atlanta, where the district court ordered a third additional Black-majority district drawn, the Remedial House Plan adds a net of only 2,661 Black voters from the identified vote-dilution area to majority districts.  Doc. 354-1 ¶ 41; *see* Doc. 356-2 at 16; Doc. 356-3 at 2, 4.

In contrast, outside the South Metro and West Metro Atlanta areas, and as set out in the below chart, the 2023 Remedial House Plan moved over 35,000 Black voters into Black-majority HDs in Cobb, Gwinnett, and Dekalb Counties—areas that were not at issue in this case and where no vote dilution remedy was ordered or required.[11]  Doc. 356-3 at 2.  The map below shows the portions of Cobb, Gwinnett, and Dekalb Counties that were added to Black-majority districts (in red).

---

[11]     The *Alpha Phi Alpha* plaintiffs did not object to the portions of the State's Remedial House Plan covering the Macon-Bibb region.



Doc. 356-2 at 14.

**County Level Population Change (House)**

| County | Enacted Majority-Black BVAP | Proposed Remedial Majority-Black BVAP | Plaintiff Remedial Majority-Black BVAP | Proposed - Enacted Difference | Plaintiff - Enacted Difference | Enacted Majority-Black Total Pop | Proposed Remedial Majority-Black Total Pop | Plaintiff Remedial Majority-Black Total Pop | Proposed - Enacted Difference | Plaintiff - Enacted Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| Baldwin | 1,497 | 14,515 | 11,811 | 13,018 | 10,314 | 5,158 | 43,799 | 31,463 | 38,641 | 26,305 |
| Bibb | 54,737 | 61,992 | 64,270 | 7,255 | 9,533 | 119,077 | 146,706 | 157,346 | 27,629 | 38,269 |
| Cobb | 48,887 | 62,455 | 48,887 | 13,568 | 0 | 118,698 | 166,408 | 118,698 | 47,710 | 0 |
| DeKalb | 279,208 | 287,747 | 279,208 | 8,539 | 0 | 498,474 | 557,965 | 498,474 | 59,491 | 0 |
| Douglas | 45,431 | 48,092 | 53,377 | 2,661 | 7,946 | 108,661 | 119,914 | 144,237 | 11,253 | 35,576 |
| Fayette | 19,042 | 19,042 | 21,158 | 0 | 2,116 | 67,022 | 67,022 | 76,946 | 0 | 9,924 |
| Fulton | 285,736 | 283,475 | 285,736 | -2,261 | 0 | 506,146 | 506,300 | 506,146 | 154 | 0 |
| Gwinnett | 28,183 | 42,868 | 28,183 | 14,685 | 0 | 74,070 | 121,471 | 74,070 | 47,401 | 0 |
| Henry | 66,214 | 78,769 | 86,793 | 12,555 | 20,579 | 155,349 | 181,793 | 218,649 | 26,444 | 63,300 |
| Newton | 32,668 | 27,122 | 32,099 | -5,546 | -569 | 75,568 | 59,413 | 73,878 | -16,155 | -1,690 |
| Houston | 0 | 11,401 | 13,271 | 11,401 | 13,271 | 0 | 30,063 | 36,952 | 30,063 | 36,952 |
| Jones | 0 | 2,178 | 0 | 2,178 | 0 | 0 | 7,786 | 0 | 7,786 | 0 |
| Monroe | 0 | 3,768 | 0 | 3,768 | 0 | 0 | 14,068 | 0 | 14,068 | 0 |
| Paulding | 0 | 0 | 5,631 | 0 | 5,631 | 0 | 0 | 23,410 | 0 | 23,410 |
| Spalding | 0 | 0 | 14,877 | 0 | 14,877 | 0 | 0 | 47,680 | 0 | 47,680 |
| Twiggs | 0 | 0 | 2,627 | 0 | 2,627 | 0 | 0 | 8,022 | 0 | 8,022 |
| Wilkinson | 0 | 0 | 2,549 | 0 | 2,549 | 0 | 0 | 8,877 | 0 | 8,877 |

Doc. 356-3 at 2.   Thus, as with the Remedial Senate Plan, Plaintiffs' evidence

showed, and it was undisputed at the remedial hearing, that the substantial changes in North Metro Atlanta drove the overall increase in the number of Black-majority HDs, allowing plan drawers to minimize new political opportunities for Black voters in the areas where vote dilution was proven.  Doc. 354-1 ¶ 41; *see* Doc. 356-2 at 16; Doc. 356-3 at 2, 4.

Finally, to show that a complete remedy was possible, Plaintiffs submitted new illustrative plans drawn by their mapping expert, Mr. Cooper.  Mr. Cooper's remedial report described how those plans complied with traditional districting principles while also creating additional political opportunities for Black voters in South Metro Atlanta—two new Black-majority SDs and two new Black-majority HDs.  *See* Doc. 354-1.  Plaintiffs' Remedial Illustrative Senate Plan added 88,035 Black voters from South Metro Atlanta to Black-majority SDs (compared to 2,940 for the 2023 Remedial Senate Plan).  Doc. 356-3 at 3.  Plaintiffs' Remedial Illustrative House Plan added 25,652 Black voters in South Metro Atlanta to Black-majority districts (compared to 15,747 in the 2023 Remedial House Plan), and added 13,577 Black voters in West Metro Atlanta to Black-majority districts (compared to 2,661 in the 2023 Remedial House Plan).  *Id.* at 4.

### D.    The District Court Overrules Plaintiffs' Objections

The district court overruled Plaintiffs' objections to the Remedial Plans in a 16-page opinion.

The district court began by characterizing as a "foundational assumption of Plaintiffs' argument" the assertion that the State was "confined to making changes only in those districts" listed in its liability order in crafting the remedial plans, and then rejected this assumption. Doc. 375 ("Op.") at 8. The court did not cite any of Plaintiffs' submissions or statements to support this characterization, and Plaintiffs expressly stated that this was not their position at the remedial hearing, *see, e.g.*, Doc. 372 at Tr. 79:20-24.

The court then acknowledged that vote dilution is not remedied by the creation of new majority-minority districts in areas of the state other than where vote dilution was shown. Op. 10 (citing *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)). However, it accepted that the renumbered districts in the 2023 Remedial Plans were "new" for remedy purposes, and on that basis concluded that there was no issue: "[A]dditional majority-Black ... Remedial SD 17 is wholly contained inside of the vote-dilution area, and Remedial SD 28 is nearly contained therein." Op. 10. For the House, the court similarly noted that the allegedly new Black-majority districts "significantly overlap[ped]" or had "significant areas in common" with the vote-dilution area. Op. 11-12. In concluding that this was enough to constitute a full remedy, the district made no findings regarding how 2023 Remedial SDs 17 and 28, or the contested 2023 Remedial HDs, could be considered "new" opportunity districts for Black voters merely because of their numbering, despite the undisputed fact that the

28

number of Black voters in Black-majority districts in the South Metro Atlanta area had barely changed.

Indeed, the district court never directly addressed Plaintiffs' evidence showing that the increase in Black voters in Black-majority districts in South Metro Atlanta was close to zero, and that the new political opportunities created by the Remedial Plans were, if anywhere, in North Metro Atlanta and not South Metro Atlanta. It concluded in a sentence that the Remedial Plans were acceptable because "'the inevitably rough-hewn, approximate redistricting remedy' will result in members of the minority group residing outside of the minority-controlled districts." Op. 13-14. The court also emphasized that deference to the state legislature drove its decision, declining to consider illustrative plans that Plaintiffs offered at the remedial stage because it concluded that doing so would "intrude upon the domain of the General Assembly." Op. 14-15 (citation omitted).

## LEGAL STANDARD

This Court reviews the district court's remedial order for abuse of discretion. *See Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 757 (11th Cir. 1996); *Thomas v. Bryant*, 919 F.3d 298, 312 (5th Cir. 2019). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors."

*United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (*en banc*).  A district court also abuses its discretion when it fails to engage in a "meaningful evaluation of all the relevant evidence." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301-1302 (11th Cir. 2020); *accord Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015).  Conclusions of law are reviewed *de novo*, and findings of fact are reviewed for clear error. *Godfrey*, 89 F.3d at 757.

When reviewing a remedial plan, the Court must consider the district court's liability findings.  A remedial plan must "*completely* remedy the Section 2 violation," *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252-53 (11th Cir. 1987), so the Court must ultimately assess whether the remedial plan "(1) perpetuates the vote dilution [the district court] found, or (2) only partially remedies it."  *Singleton v. Allen*, 2023 WL 5691156, at *50 (N.D. Ala. Sept. 5, 2023) (citations and subsequent history omitted).

## SUMMARY OF ARGUMENT

The 2023 Remedial Plans did not remedy the Section 2 violation proven at trial.

This Court has held that "when devising election plans to remedy section 2 violations, federal courts 'should exercise ... traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength

and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.'" *United States v. Dallas Cnty. Comm'n, Dallas Cnty., Ala.*, 850 F.2d 1433, 1438 (11th Cir. 1988) (quoting S. Rep. No. 97-417, at 31 (1982)) (alteration in original).  But that is not what happened here.  Instead, the district court accepted the 2023 Remedial Plans because the statewide map added Black-majority Senate and House districts, including ostensibly "new" (*i.e.*, newly numbered) districts that were near South Metro Atlanta.  But those supposedly "new" districts provide no relief to Black voters in South Metro Atlanta whose votes were diluted by cracking them into White-majority districts, and they certainly did not provide the complete relief required by binding precedent.  The net increase of Black voters in Black-majority districts *in South Metro Atlanta*, especially in the Senate, is essentially *zero*.  The political opportunities for Black voters in South Metro Atlanta are unchanged.  The 2023 Remedial Plans are not a valid remedy for vote dilution in South Metro Atlanta as a matter of law.

Plaintiffs' undisputed evidence proved that the State changed far too little in South Metro Atlanta for its measures to qualify as a complete remedy, but the district court ignored that evidence entirely and instead deferred to the State on the scope of its Section 2 obligations.  That approach violated settled precedent on what Section 2 requires and constituted an abuse of discretion.  This Court should reverse, or at a minimum vacate the decision below and order the appointment of a Special Master.

**ARGUMENT**

I. **IN THE ABSENCE OF NEW POLITICAL OPPORTUNITIES, NEWLY NUMBERED DISTRICTS ARE NOT A COMPLETE REMEDY FOR VOTE DILUTION**

The district court began and ended its analysis by concluding that because the 2023 Remedial Plans nominally increased the number of Black-majority districts, the State had redressed the Section 2 violations. That was legal error. Because the Remedial Plans create newly *numbered* districts but do not add new opportunities for Black voters in South Metro Atlanta, they cannot be a complete remedy for the Section 2 vote dilution violations occurring in that area.

A. **A Section 2 Remedy Must Provide Injured Voters With New Opportunities For Minority Voters To Elect Candidates Of Their Choice**

Once a Section 2 violation has been found, a court must "exercise its traditional equitable powers to "*completely* remed[y] the prior dilution of minority voting strength and *fully* provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dillard v. Crenshaw County*, 831 F.2d 246, 250 (11th Cir. 1987); *see also id.* at 252-53. As in all equity cases, "the nature of the violation determines the scope of the remedy." *Miss. State Ch., Operation PUSH v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991).

Remedying vote dilution violations requires the creation of new opportunities to elect candidates of choice for the minority voters who have been harmed. Where vote dilution has been found, a court has necessarily determined after trial that, in a

32

particular area, minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). The creation of "an additional district in which Black voters either comprise a voting-age majority or otherwise have an opportunity to elect a representative of their choice" remedies the vote dilution harm by correcting for that racial imbalance in political opportunity. *E.g.*, *Singleton v. Allen*, 2023 WL 5691156, at \*50 (N.D. Ala. Sept. 5, 2023), *appeal dismissed sub nom. Milligan v. Co-Chairs of Alabama Permanent Legislative Comm. On Reapportionment*, 2023 WL 6568350 (11th Cir. Oct. 3, 2023).

Especially given the "intensely local appraisal" required in Section 2 vote dilution cases, *e.g.*, *Allen v. Milligan*, 599 U.S. 1, 19 (2023), a complete and adequate Section 2 remedy therefore *must* address vote dilution in a *localized* manner, by creating new opportunities for minority voters in the specific areas where violations were proven up at trial. Creating new political opportunities for minority voters somewhere else does not do the job: A state may not "trade off the rights of some against the rights of others," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 437 (2006). To the contrary, because the right to an undiluted vote belongs to the "individual members" of a minority group and not to the group as a whole, an adequate remedy must address the "vote dilution injuries suffered by [those] persons." *Shaw*, 517 U.S. at 917.

*Shaw* stands squarely for the proposition that, with respect to minority vote dilution, it is the minority voters *in the area where dilution has been shown* whose interests matter for purposes of the remedy—not minority voters as a whole, or minority voters elsewhere in the state. *See* 517 U.S. at 917. *Shaw* involved a racial gerrymandering challenge to a Black-majority North Carolina congressional district, which state mapdrawers defended by claiming it was necessary to remedy vote dilution that had previously been identified in certain areas of the state. *Id.* at 906. The Supreme Court rejected this defense because *the minority voters in those identified areas* were not the primary beneficiaries of the new political opportunity created by the challenged Black-majority district. As the Court explained:

> If a § 2 violation is proved for a particular area, it flows from the fact that individuals in this area "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The vote-dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State.

*Shaw*, 517 U.S. at 917. And the Court reached this conclusion even though some portion of the challenged district was in Mecklenburg County, where vote dilution had been identified. *Id.* at 918. Because the Mecklenburg County portion of the challenged district was "not more than 20% of the district," the Court reasoned, it still could not be said to "substantially address[] the § 2 violation" harming Mecklenburg County voters. *Id.*

34

*Shaw*'s teaching is clear:  A valid Section 2 remedy, one that "substantially address[es] the § 2 violation," requires creating new political opportunities that benefit the specific minority voters who are harmed by the violation.[12]  The district court simply assumed that *Shaw* was "inapposite" because it was a racial gerrymandering case, *see* Op. 8-9 n.4, and in doing so ignored *Shaw*'s clear statement about the proper way to remedy a Section 2 violation.  Disregarding *Shaw* led the court to err.

This Court's opinion in *Dallas County*, vacating a district court's remedial plan after finding that the plan was not a complete remedy, similarly illustrates what is required.  In *Dallas County*, the district court held that an at-large method of electing officials to the County Commission and School Board impermissibly diluted Black voting strength.  850 F.2d at 1435.  At the remedial stage, the district court ordered into effect a modified version of the County Commission plan that continued to include one at-large seat, which would necessarily be "beyond the reach of black voters given the political environment in Dallas County which is dominated by racially-charged concerns."  *Id.* at 1438.  This Court vacated the district court's remedial plan, finding that was an incomplete remedy because "many of the

---

[12]    To be sure, no particular individual plaintiff "has the right to be placed in a majority-[Black] district once a violation of the statute is shown," *Shaw*, 517 U.S. at 917 n.9.  But Section 2 nevertheless requires that the additional minority-opportunity district create a new opportunity to elect candidates of choice for minority voters in the specific area where vote dilution is occurring.  *E.g.*, *id.* at 917.

concerns which prompted [an earlier] remand of this case … continue to exist." *Id.* at 1438-1439.  By failing to complete abate the specific cause of vote dilution, the new plan, if anything, "perpetuate[d] rather than "ameliorate[d] the inequities which have resulted in an abridgement of Dallas County's black citizens' access to the political process." *Id.*

The complete-remedy requirement—including the requirement that Section 2 remedies inure to the specific voters who are harmed by vote dilution and the denial of equal opportunities to elect candidates of choice—is a legal rule.  It thus cannot be overridden on the basis of mapdrawers' policy desires, such as incumbent protection or partisan advantage.  To be sure, "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt," and "adopting a substitute measure" passed by the legislature is on balance preferred in the redistricting context. *Wise v. Lipscomb*, 437 U.S. 535, 539-540 (1978).  But such deference is limited to the range of alternatives that comply with the law and completely remedy the violation of federal law.  A legislature's remedial plan cannot be put into effect if "it, too, is challenged and found to violate" federal law. *Id.* (emphasis added).  Simply put, remedial redistricting plans may not follow legislative preferences where they "'lead to violations of the Constitution or Voting Rights Act.'" *Perry v. Perez*, 565 U.S. 388, 393 (2012) (*per curiam*); *see also Dillard*, 831 F.2d at 249 ("[A]ny proposal to

remedy a Section 2 violation must itself conform with Section 2."). The Court in *Shaw* similarly recognized States' "broad discretion in drawing districts to comply with the mandate of § 2," but it rejected the challenged district there as a Section 2 remedy for failure to address the harms to affected voters. 517 U.S. at 917 n.9.

None of this means that, in crafting a remedial plan to address vote dilution in one area, states are somehow foreclosed from conducting redistricting in other areas as well. Plaintiffs never claimed that Georgia mapdrawers were "confined to making changes only in [the enumerated] districts when creating the 2023 Remedial Plans," as the district court suggested. Op. 8-9. They in fact argued the opposite. *See* Doc. 372 at Tr. 79:20-24. But as cases like *Shaw* and *Dallas County* teach, changes to areas outside of the places where vote dilution was proven are irrelevant when it comes to remedying the Section 2 violation at issue. While States engaging in redistricting to remedy vote dilution *may* make a wide range of changes anywhere, they *must* add new opportunity districts for minority voters in the specific areas where vote dilution has been proven.

### B.    The 2023 Remedial Plans Do Not Provide Injured Black Voters In South Metro Atlanta With New Opportunities To Elect Candidates Of Choice

The district court's acceptance of the 2023 Remedial Plans rested entirely on its assumption that they included "additional majority-Black Senate districts" sufficient to cure the proven vote dilution. *See* Op. 10. As to the 2023 Remedial

Senate Plan, the court's sole support for its conclusion was the observation that "Remedial SD 17 is wholly contained inside of the vote-dilution area, and Remedial SD 28 is nearly contained therein."  Op. 10, 15.  With respect to the House, the court similarly concluded that the three "new" Black-majority districts were a valid remedy because they "significantly overlap[ped]" or had "significant areas in common" with the vote-dilution area.  Op. 11-12.

This was error.  Districts like Remedial SD 17 and SD 28 are only "new" Black-majority districts inasmuch as the 2023 Remedial Plans newly assigned those particular district numbers to Black-majority districts.  These "new" districts did *not* result in new opportunities to elect candidates of choice for Black voters in South Metro Atlanta, which is the critical question for purposes of determining whether there has been a complete remedy for vote dilution, *see supra* pp. 32-37.  Rather, as explained already and summarized below, the South Metro area Black voters who were placed in those newly renumbered Black-majority districts largely *already* resided in Black-majority districts where they could elect candidates of choice under the old plan.  Meanwhile, for the South Metro area Black voters whose votes were unlawfully diluted by placing them in White-majority districts like 2021 SD 16 and 17, the 2023 Remedial Plans offer no change at all.

***2023 Remedial SD 17.***   In the 2023 Remedial Senate Plan, the newly numbered SD 17 was created mainly by cobbling together portions of two existing

Black-majority districts (2021 Enacted SDs 10 and 44) where Black voters already could elect candidates of choice. Approximately 80% of the overall population and nearly 80% of the Black population of 2023 Remedial SD 17 is drawn from those existing Black-majority districts. Doc. 356-7 at 2. 2023 Remedial SD 17 also adds some Black voters from Henry County who had previously been in White-majority 2021 Enacted SD 17 (fewer than 20,000, less than a third of the Black population of 2021 Enacted SD 17, *see* Doc. 356-7 at 2). But that change was offset by moving other South Metro area Black voters in Newton County *out* of an existing Black-majority district, and into White-majority 2023 Remedial SD 42, depriving those voters of an opportunity to elect candidates of their choice. On net, the changes in creating 2023 Remedial SD 17 add only a few thousand South Metro area Black voters to Black-majority districts where they will gain the opportunity to elect preferred candidates. Doc. 356-3 at 1. And meanwhile, 2023 Remedial SD 42, though renumbered, maintains almost the exact same sprawling configuration and the same BVAP as White-majority 2021 Enacted SD 17, the "jagged" district that Plaintiffs successfully challenged at trial. *See supra* p. 10.

*2023 Remedial SD 28.* The other newly numbered Senate District, 2023 Remedial SD 28, followed a similar pattern. Doc. 356-3 at 1; Doc. 356-2 at 3. Approximately 80% percent of the Black voters in the 2023 Remedial SD 28 already lived in Black-majority districts and were thus already able to elect candidates of

choice under the 2021 Plan. Doc. 354-1 ¶ 16; 356-7 at 3-4. Another 19% percent of the Black voters assigned to 2023 Remedial SD 28 were newly placed in a Black majority district, but reside in Cobb County in North Metro Atlanta, where there was no claim or evidence of vote dilution in the State Senate map at trial. *Id*. Thus, only 1% percent of the Black voters in the 2023 Remedial SD 28, 2,403 in total, are South Metro area Black voters who were newly added to a Black-majority district where they could elect preferred candidates in the 2023 Remedial Senate Plan. *Id*. And here too, this small group of newly added voters, in the far southern corner of Fulton County, were offset by the removal of thousands of Black voters from an existing Black-majority district in Douglas County, depriving them of an opportunity to elect candidates of choice. Doc. 356-3 at 1; Doc. 356-2 at 3.

Meanwhile, the district lines of 2021 Enacted SD 16 in Fayette County and Spalding County, another core focus of Plaintiffs' successful trial case, remain completely unchanged in the 2023 Remedial Plans—meaning that Black voters in those counties necessarily have no new opportunities to elect preferred candidates. In total, across the South Metro Atlanta area, it was undisputed that fewer than 3,000 Black voters on net gained a new opportunity to elect candidates of their choice despite proven racial polarization in the area—a "miniscule" amount, and orders of magnitude less than what would have been needed to actually create two additional Black-opportunity districts in the area. *See supra* pp. 21-22, 27. The district court's

40

acceptance of the 2023 Remedial Senate Plans' renumbered districts as a valid remedy despite the undisputed evidence that conclusively showed that South Metro Atlanta Black voters gained no new opportunities to elect candidates of choice to the State Senate was error.

*2023 Remedial HDs 74 and 117.* Much the same was true in the House. As with the Senate, at the liability phase the district court held that Black voting strength in South Metro had been so badly diluted in the 2021 Enacted Plan that two new Black-majority districts needed to be drawn to create new opportunities for Black voters to elect preferred candidates. Merits Op. 509. The changes wrought by the 2023 Remedial House Plan were more significant than in the Senate, but the State still created the ostensibly "new" Black-majority districts largely by over-relying on Black voters who already lived in Black-majority districts and could already elect candidates of choice under the 2021 Plan. For example, most of the Black population in 2023 Remedial HD 117 (22,025, comprising 68.28% of the overall Black population in the district) came from 2021 HD 115, which was already majority Black. Doc. 356-25 at 5-6. As with the Senate, the 2023 Remedial House Map offsets the addition of some South Metro Black voters into "new" Black-majority districts by removing others from existing Black-majority districts, as in Henry and Newton Counties. Doc. 356-3 at 2. And the overall numbers tell a similar story as with the Senate: The net addition of 15,747 South Metro Atlanta Black

voters to Black-majority districts is mathematically insufficient to create two additional Black-majority districts where Black voters will gain opportunities to elect candidates of choice. *See* Doc. 356-3 at 4; Doc. 354-1 ¶¶ 41-42 ("The net 15,747 Black voters moved into Black-majority districts is not enough to bring any two non-Black-majority House Districts in the vote-dilution area above 50% BVAP."). But, as with the Senate, this insufficiency was masked by the addition of tens of thousands of Black voters *outside* of the South Metro Atlanta vote-dilution area, in places like Gwinnett County, into Black-majority districts. *See* Doc. 356-3 at 2. The end result is newly *numbered* House districts in South Metro Atlanta without the required two *new* opportunities for Black voters in that area to elect State House candidates of their choice.

The district court erred in accepting mere renumbering where the law required new opportunities to elect candidates of choice for Black voters in South Metro Atlanta. The merely renumbered districts, which in the Senate left the challenged 2021 Enacted Plan essentially unchanged in its configuration of the South Metro Atlanta area, do not provide any remedy for the vote dilution proven, let alone the complete remedy required by binding precedent. Accepting the 2023 Remedial Plans was legal error and requires reversal.

## II. THE DISTRICT COURT FAILED TO CONSIDER IMPORTANT, UNDISPUTED EVIDENCE AND ABUSED ITS DISCRETION

The Court can also reverse (or at a minimum, vacate and remand) because the district court abused its discretion in the way it decided Plaintiffs' objections. "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (*en banc*). The district court here ignored or failed to consider important evidence, and overemphasized inapposite or minimally relevant considerations.

Most importantly, because the district court considered it sufficient that the 2023 Remedial Plans contain newly numbered Black-majority districts in the general vicinity of South Metro Atlanta, it refused to reach the heart of the inquiry: Whether the vote dilution in South Metro Atlanta was in fact remedied by the 2023 Remedial Plans. *See, e.g.*, *Dillard*, 831 F.2d at 252-53.

Plaintiffs' undisputed evidence proved that it was not. Plaintiffs showed at trial that the South Metro Atlanta area, and especially the five-county region including Fayette, Spalding, Henry, and Newton Counties, was rapidly growing and could support multiple additional Senate and House districts. At the remedial hearing, Plaintiffs adduced undisputed evidence showing that the number of Black-majority districts in South Metro Atlanta remained stagnant and that Black voters in

43

South Metro Atlanta gained no new opportunities to elect candidates of choice. Absent such new opportunities, South Metro Atlanta Black voters continue to have their votes diluted. Yet the district court did not address any of this critical evidence.

The most telling indication that the 2023 Remedial Senate Plans do not remedy vote dilution is that the two 2021 Enacted Senate districts at the heart of Plaintiffs' trial case—2021 SD 16 and 17—remain almost entirely intact. These districts were the subject of extensive attention at trial. *See*, *e.g.*, Merits Op. 284-287, 292-295; Doc. 357-1 ¶¶ 44-46, 127-128; Doc. 325 at Tr. 113:6-114:25, 116:6-8; Doc. 383 at Tr. 231:14-20, 238:23-239:3; Doc. 329 at Tr. 1298:16-20, 1302:9-11, 1306:6-16, 1306:23-25, 1308:23-1309:8; Doc. 330 at Tr. 1685:2-22; Doc. 331 at Tr. 1982:7-12. Yet Senate District 16—which includes Fayette and Spalding Counties—did not change at all. Both the 2021 Enacted Senate Plan and the 2023 Remedial Plan split the Black-majority community of Fayetteville in two, packing Black-majority neighborhoods in northeast Fayette County into SD 34 (which was also unchanged, remaining a 70.29% BVAP district, *see* Doc. 356-7 at 4-5) and then join the remaining areas of Fayette County with Spalding County and predominantly White Pike and Lamar Counties in SD 16, causing vote dilution. The areas most affected by the 2021 Plan's dilutive effects saw no relief whatsoever. No Black voters in Tyrone, Georgia—a Black-majority city in Fayette County where named plaintiff Eric Woods lives—were added to a Black-majority district that afforded

44

them an opportunity to elect a candidate of their choice. Other communities that were discussed extensively at trial, like Fayetteville in Fayette County, Griffin in Spalding County, or McDonough in Henry County, are similar unaffected or only minorly affected by the 2023 Remedial Senate Plan.

The story is the same in 2021 Enacted SD 17, the "jagged" district stretching from Henry County and the diverse Atlanta suburbs out to Morgan and Walton Counties whose configuration (along with 2021 SD 16) caused vote dilution in South Metro Atlanta. Under the 2023 Remedial Senate Plan, 2021 SD 17 became 2023 Remedial SD 42—renumbered but almost identically configured. Just like 2021 SD 17, Remedial SD 42 starts in diverse areas of Henry County, extends into (and splits) Newton County, and then extends further into predominantly White and more rural Walton and Morgan Counties. Merits Op. at 284-286. Over 75% of the population of the two districts is the same. Doc. 356-7 at 6.[13] For the remaining 25%, Black voters in South Henry County were exchanged for Black voters in neighboring Newton County, removing the Newton County Black voters from an existing Black-majority district, 2021 Enacted SD 43. Doc. 354-1 ¶ 16; Doc. 356-2 at 3; Doc. 356-3 at 1. As a result, Remedial SD 42 maintains almost the exact same overall shape,

---

[13]    As noted above, core constituency reports compare the percentage of a population in a previous district to a new district.

almost the exact same BVAP, and the exact same effect of the unlawful 2021 Enacted SD 17.

The empirical data and analysis that Plaintiffs submitted—and that the district court seemingly refused to consider—confirms the point. *No* Black voters in Fayette, Spalding, or Rockdale Counties were added to new Black-majority districts, and over 17,000 Black voters in Newton County were *removed* from Black-majority districts altogether, offsetting any the similarly sized increases in Henry County. *See* Doc. 356-3 at 1. In order to generate an overall increase in Black-majority districts without changing the number of opportunity districts in South Metro Atlanta, around 95,000 Black voters from the North Metro Atlanta area were newly added to Black-majority districts. Doc. 356-3 at 1, 3 (95,500 added outside the vote-dilution area, including 29,945 in Cobb County and 47,383 in DeKalb County); *see also* Doc. 354-1 ¶ 18; Doc. 372 at 81:25-82:3. The undisputed empirical analysis thus showed that while Black voters in North Metro Atlanta may have seen increased influence under the 2023 Remedial Senate Plan, political opportunities for Black voters in South Metro Atlanta—where vote dilution was proven—did not change.

The empirical evidence presented for the 2023 Remedial House Plan is similar. As with the Senate, it demonstrates that the major changes happened in North Metro Atlanta. In South Metro Atlanta, the Remedial Plan fails to create the additional opportunity districts for Black voters required to completely remedy vote

dilution.  *See supra* pp. 24-26; Doc. 356-3 at 4 (noting that outside the vote-dilution area, 35,717 Black voters were added to Black-majority districts, while in South Metro Atlanta, only 15,747 were added).

The district court simply ignored the volumes of evidence that Plaintiffs submitted (and that the Secretary never contested), including maps, empirical data, and an expert report, proving that the 2023 Remedial Plans perpetuated the same vote dilution in South Metro Atlanta that was proven at trial.  The court's decision made only a single, oblique reference to this extensive evidence, in which it mischaracterized Plaintiffs' argument as being "that the 2023 Remedial Plans do not cure vote dilution for enough Black voters in the specified areas."  Op. 13 (citation omitted).  But Plaintiffs' evidence showed not just that *some* Black voters in South Metro Atlanta might not benefit from the remedy, but that virtually *none* would do so, especially with respect to the 2023 Remedial Senate Plan.  Under *Dillard* and *Shaw*, Plaintiffs' evidence demonstrating the total inefficacy of the 2023 Remedial Plans, especially in the Senate, was highly relevant.  And yet the district court failed to evaluate it at all—much less afford it the "meaningful evaluation" that was required.  *Wright*, 979 F.3d at 1301-1302; *see also Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) (court was "required to 'consider all relevant evidence'").

The district court likewise refused to engage with the remedy-stage illustrative plans submitted by Plaintiffs, which showed what it might look like to actually create new opportunity districts for Black voters in South Metro Atlanta. The court mistakenly assumed that the only purpose Plaintiffs' illustrative plans might serve was to prove that Plaintiffs could devise "better remedies than the State's Remedial Plans." Op. 14. So, the court explained, it "decline[d] Plaintiffs' invitation to compare the 2023 Remedial Plans with plans preferred by Plaintiffs." *Id.* But that conclusion ignores this Court's repeated admonitions that illustrative plans are necessary for proving Section 2 violations. *E.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *see also Holder v. Hall*, 512 U.S. 874, 880 (1994) ("In a § 2 vote dilution suit, … a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice."). Plaintiffs' remedy-stage illustrative plans proved that a complete remedy was possible, and gave some sense of how many Black voters from South Metro Atlanta would need to be added to Black-majority districts to create the required new opportunity districts in the South Metro area. *See* Doc. 356-3 at 3 (Plaintiffs' Remedial Illustrative Senate Plan added 88,035 Black voters in the vote-dilution area to Black-majority districts, compared to the 2023 Remedial Senate Plan's 2,940); *id.* at 4 (Plaintiffs' Remedial Illustrative House Plan added 25,652 Black voters in South Metro Atlanta to Black-majority districts, compared to the 2023 Remedial House

48

Plan's 15,747). The remedy-stage illustrative plans vividly demonstrated the failure of the 2023 Remedial Plans to completely remedy vote dilution in South Metro Atlanta, but the district court expressly refused to give them consideration. *See Wright*, 979 F.3d at 1301-1302 (the district court must conduct a "meaningful evaluation" of all relevant evidence).

In addition to ignoring an array of critical, relevant, and undisputed evidence showing that the 2023 Remedial Plans did not remedy vote dilution in South Metro Atlanta, the district court also appeared to misapprehend Plaintiffs' underlying argument. The district court mistakenly thought that Plaintiffs' arguments were based on the assumption that "because the [Merits Opinion] listed specific House and Senate districts from the 2021 Enacted Plan where it found that Plaintiffs had proven vote dilution … the State was confined to making changes only in those districts when creating the 2023 Remedial Plans." Op. 8. That was incorrect. Plaintiffs' argument was (and is) that whatever other changes the State made, its duty was to ensure that the vote dilution *in South Metro Atlanta* was remedied. *See, e.g.*, Doc. 372 at Tr. 79:20-24 (Plaintiffs' counsel at the remedial hearing: "So let me be clear: It doesn't matter in our view what was happening in old District 42. It doesn't matter who elected Democrats. It doesn't matter if it was a coalition district, anything like that. The only thing that matters is that it's not in South Metro Atlanta."). The district court's failure to address that argument—and its conclusion

49

that Plaintiffs were arguing something else entirely—likewise indicate an abuse of discretion. *Cf. James River Ins. Co. v. Rich Bon Corp.*, 34 F.4th 1054, 1061-1062 (11th Cir. 2022).

Finally, the district court also improperly emphasized the deference it believed it owed to the General Assembly. Against evidence that adequate relief was possible (and therefore necessary) and that the 2023 Remedial Plans did not provide such relief in South Metro Atlanta, the district court suggested that the efficacy of the remedy is "the domain of the General Assembly." Op. 14. It suggested that the General Assembly was entitled to choose *where* it provides additional opportunities for Black voters to elect preferred candidates, and that the General Assembly's stated goal of "securing partisan advantage" might be a valid reason to avoid creating those additional opportunities in South Metro Atlanta. Op. 14-15. Those suggestions were wrong. While the General Assembly had latitude in selecting among *lawful* remedial plans, its policy objectives cannot come at the cost of compliance with federal law. In *LULAC v. Perry*, 548 U.S. 399 (2006), the Supreme Court affirmed that while considerations like "incumbency protection can be a legitimate factor in districting," and may be "valid[] in the realm of politics," such explanations for particular districting decisions "cannot justify" a plan that results in minority vote dilution. *Id.*

at 440-441.[14]  So too here.  Deference to legislative mapdrawers' otherwise-legitimate goals applies only insofar as those goals are achieved through lawful plans.  Here, where the unlawfulness of the 2021 Enacted Plans' configuration of South Metro Atlanta was proven at trial, re-enacting maps that have virtually identical effects for Black voters in South Metro Atlanta simply was not within the range of permissible options.

The district court's overemphasis on deference, even at the expense of enacting a lawful remedy, was an abuse of discretion.  *See Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003) (a court abuses its discretion when it "overlook[s] some highly relevant factors" or when it "str[ikes]" an unreasonable balance among the relevant factors).  Along with its refusal to consider or engage with reams of evidence proving that the 2023 Remedial Plans do not provide South Metro Atlanta Black voters with new opportunities to elect candidates of choice, that overemphasis on deference led the district court to adopt an invalid and impermissible remedy.  This Court should reverse or vacate and remand with orders to put in place a remedy

---

[14]    *LULAC*'s reasoning is in stark contrast to what happened in this case.  Here, the district court expressly credited the legislature's stated interest in securing partisan advantage, observing that "federal judges have no license to reallocate political power between the two major political parties, given the lack of constitutional authority and the absence of legal standards to direct such decisions." Op. 15.  After explaining that "the committee hearing transcripts show that the General Assembly created the 2023 Remedial Plans in a manner that politically protected the majority party (i.e., the Republican Party) as much as possible," the district court overruled "Plaintiffs' objections to the contrary."  Op. 14-15.

that complies with federal law and cures the Section 2 violations in South Metro Atlanta that Plaintiffs established at trial.

## CONCLUSION

The Court should reverse or vacate the district court's December 28, 2023 order and remand with instructions that the district court appoint a special master or adopt any other lawful remedial plans.

Respectfully submitted.

/s/ *Ari J. Savitzky*

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
MAURA DOUGLAS
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

ARI J. SAVITZKY
SOPHIA LIN LAKIN
MING CHEUNG
CASEY SMITH
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 519-7836

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
   GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

SONIKA R. DATA
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,063 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font in text and footnotes.

/s/ *Ari Savitzky*
Ari Savitzky

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will automatically send a notice of the electronic filing to all registered CM/ECF users who have entered an appearance in the case.

This 3rd day of May, 2024.

/s/ *Ari Savitzky*
Ari Savitzky