No. 24-10230

# In the
# United States Court of Appeals
## for the Eleventh Circuit

Alpha Phi Alpha Fraternity, Inc., et al.,

*Plaintiff-Appellants*,

v.

Secretary of State of Georgia,

*Defendant-Appellee*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05337 — Steve C. Jones, *Judge*

## BRIEF OF THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Albert M. Pearson LLC, Counsel for Amicus;

Allensworth, Robert M., Attempted Amicus;

Alpha Phi Alpha Fraternity, Inc., *APA* Plaintiff;

Adegbile, Debo, Counsel for *APA* Plaintiffs;

Allen, De'Ericka, Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation, Inc., Counsel for *APA* Plaintiffs;

American Civil Liberties Union Foundation of Georgia, Inc., Counsel for *APA* Plaintiffs;

Arbuthnot, Jacqueline Faye, *Grant* Plaintiff;

Bokat-Lindell, Noah B., Counsel for Intervenor U.S. Department of Justice;

Boone, Robert, Counsel for *APA* Plaintiffs;

Bowles, Jasmine, Amicus;

Boyle, Jr., Donald P., Counsel for Defendant;

Brown, Phil, *APA* Plaintiff;

Brown, Theron, *Grant* Plaintiff;

Bush, Jacquelyn, *Grant* Plaintiff;

Calvo-Friedman, Jennessa, Former Counsel for *APA* Plaintiffs;

Carr, Christopher M., Counsel for Defendant;

Cheung, Ming, Counsel for *APA* Plaintiffs;

Common Cause, Amicus;

Conner, Mary Nell, *Grant* Plaintiff;

Crowell & Moring LLP, Counsel for Amicus;

Data, Sonika, Counsel for *APA* Plaintiffs;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Draper, Paul, Assistant Solicitor General, Counsel for Defendant;

Georgia Department of Law, Counsel for Defendant;

Davis, Alexander S., Counsel for Amicus;

Dechert LLP, Counsel for Amicus;

DiGiuseppe, Marisa A., Counsel for *APA* Plaintiffs;

Dixit, Anuj, Counsel for *APA* Plaintiffs;

Douglas, Maura, Counsel for *APA* Plaintiffs;

Duffey, Jr., William S., Former Defendant in *Grant* and *Pendergrass*;

Election Law Clinic at Harvard Law School, Amicus;

Elias Law Group LLP, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Fair Districts GA, Amicus;

Flynn, Erin H., Counsel for Intervenor;

Ford, Christina Ashley, Counsel for *Grant* and *Pendergrass*
    Plaintiffs;

Freeman, Daniel J., Counsel for Intervenor;

GALEO Latino Community Development Fund, Inc., Amicus;

Garabadu, Rahul, Former Counsel for *APA* Plaintiffs;

Geaghan-Breiner, Charlotte, Counsel for *APA* Plaintiffs;

Genberg, Jack, Counsel for Amicus;

Georgia Coalition for the People's Agenda, Amicus;

Georgia State Conference of the NAACP, Amicus;

Ghazal, Sara Tindall, Former Defendant in *Grant* and
    *Pendergrass*;

Glaze, Ojuan, *Pendergrass* Plaintiff;

Glenn, Katie Bailey, *APA* Plaintiff;

Grant, Annie Lois, *Grant* Plaintiff;

Graves, Cheryl, Amicus;

Greenbaum, Jon, Counsel for Amicus;

Greenwood, Ruth M., Counsel for Amicus;

Hamilton, Kevin J., Former Counsel for *Grant* and *Pendergrass*
    Plaintiffs;

Harrison, Keith, Counsel for Amicus;

Hawley, Jonathan Patrick, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Heard, Bradley E., Counsel for Amicus;

Heaven, Astor H.L., Counsel for Amicus;

Hennington, Elliott, *Pendergrass* Plaintiff;

Hessel, Daniel J., Counsel for Amicus;

Houk, Julie M., Counsel for Amicus;

Howell, Quentin T., *Grant* Plaintiff;

Isaacson, Cory, Counsel for *APA* Plaintiffs;

Ivey, Marvis McDaniel, Amicus;

Jacoutot, Bryan F., Counsel for Defendant;

Jackson, Toni Michelle, Counsel for Amicus;

James, Triana Arnold, *Grant* and *Pendergrass* Plaintiff;

Jamieson, Nathan, Counsel for Amicus;

Johnston, Janice W., Former Defendant in *Grant* and *Pendergrass*;

Jones, Michael Brandon, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Jones, Steve C., Judge, U.S. District Court, Northern District of Georgia;

Kastorf Law LLP, Counsel for Amicus;

Kastorf, Kurt, Counsel for Amicus;

Khanna, Abha, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Kim, Eliot, Former Counsel for *APA* Plaintiffs;

Kim, Taeyoung, Counsel for *APA* Plaintiffs;

Krevolin & Horst LLC, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lakin, Sophia Lin, Counsel for *APA* Plaintiffs;

LaRoss, Diane F., Counsel for Defendant;

Lawyers' Committee for Civil Rights Under Law, Counsel for Amicus;

Le, Anh, Former Defendant in *Grant* and *Pendergrass*;

League of Women Voters of Georgia, Amicus;

Lee, Theresa J., Counsel for Amicus;

Lewis, Joyce Gist, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Lindsey, Edward, Former Defendant in *Grant* and *Pendergrass*;

Love-Olivo, Cassandra Nicole, Counsel for Amicus;

Mashburn, Matthew, Former Defendant in *Grant* and *Pendergrass*;

May, Caitlyn Felt, Counsel for *APA* Plaintiffs;

McGowan, Charlene, Former Counsel for Defendant;

Miller, Alex W., Counsel for *APA* Plaintiffs;

Miller, Kelsey A., Counsel for *APA* Plaintiffs;

Mitchell, Cassandra, Counsel for *APA* Plaintiffs;

O'Donnell, Courtney, Counsel for Amicus;

Osher, Daniel C., Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Paradise, Loree Anne, Former Counsel for Defendant;

Pearson, III, Albert Matthews, Counsel for Amicus;

Pendergrass, Coakley, *Pendergrass* Plaintiff;

Perkins Coie LLP, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Perkins, Brianne, Amicus;

Petrany, Stephen J., Solicitor General, Counsel for Defendant;

Raffensperger, Brad, Defendant in his official capacity as Secretary of State of Georgia;

Reynolds, Garrett, *Grant* Plaintiff;

Richards, Roberts, *Pendergrass* Plaintiff;

Rollins-Boyd, David, Counsel for Amicus;

Rosenberg, Ezra D., Counsel for Amicus;

Rueckert, Jens, *Pendergrass* Plaintiff;

Ruiz Toro, Juan M., Counsel for *APA* Plaintiffs;

Rutahindurwa, Makeba, Counsel for *Grant* and *Pendergrass* Plaintiffs;

Savitsky, Ari J., Counsel for *APA* Plaintiffs;

Shaw, Abigail, Former Counsel for *APA* Plaintiffs;

Sivaram, Anuradha, Former Counsel for *APA* Plaintiffs;

Sixth District of the African Methodist Episcopal Church, *APA* Plaintiff;

Smith, Casey Katherine, Counsel for *APA* Plaintiffs;

Solomon, Elbert, *Grant* Plaintiff;

Southern Poverty Law Center, Counsel for Amicus;

Sparks, Adam M., Counsel for *Grant* and *Pendergrass* Plaintiffs;

Steiner, Neil, Counsel for Amicus;

Stewart, Janice, *APA* Plaintiff;

Stewart, Michael Elliot, Counsel for Intervenor;

Strickland, Frank B., Counsel for Defendant;

Sullivan, Rebecca N., Former Defendant in *Grant* and *Pendergrass*;

Sykes, Eunice, *Grant* Plaintiff;

Taylor English Duma LLP, Counsel for Defendant;

Thomas, Ursula, Amicus;

Tolbert, Elroy, *Grant* Plaintiff;

Tsai, Denise, Counsel for *APA* Plaintiffs;

Tyson, Bryan P., Counsel for Defendant;

United States Department of Justice, Intervenor;

Varghese, George P., Counsel for *APA* Plaintiffs;

Vaughan, Elizabeth Marie Wilson, Former Counsel for Defendant;

Webb, Bryan K., Counsel for Defendant;

Weigel, Daniel H., Counsel for Defendant;

Weitzman, Samuel, Former Counsel for *APA* Plaintiffs;

White, Graham, Former Counsel for *Grant* and *Pendergrass* Plaintiffs;

Willard, Russell D., Former Counsel for Defendant;

Williams, Ayana, Former Counsel for *APA* Plaintiffs;

Williams, H. Benjamin, Amicus;

Williams, Edward Henderson, Former Counsel for *APA* Plaintiffs;

Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for *APA* Plaintiffs;

Wimbish, Dexter, *Grant* Plaintiff;

Woods, Eric T., *APA* Plaintiff;

Young, Sean Jengwei, Former Counsel for *APA* Plaintiffs;

Zabel, Joseph D., Former Counsel for *APA* Plaintiffs

Respectfully submitted this 2nd day of August, 2024.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary requests oral argument. Though the legal issues should not be difficult, the record is extensive and oral argument could help the Court in resolving the appeal.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument.............................................. i

Table of Authorities ..................................................................... iv

Introduction ................................................................................. 1

Statement of the Case.................................................................. 3

    A. Factual background.............................................................. 4

        1. Georgia enacts new redistricting maps in the wake of the 2020 census. ............................................................. 4

        2. Plaintiffs challenge Georgia's maps............................... 5

        3. The legislature adopts remedial maps........................... 6

            a. State Senate remedial plan ...................................... 7

            b. State House remedial plan ....................................... 9

    B. The district court determines that the remedial maps "fully complied" with its order.................................................... 12

    C. Standard of review. ........................................................... 14

Summary of Argument ............................................................... 15

Argument ................................................................................... 19

    I. The remedial maps complied with the district court's order. ................................................................................... 19

    II. Plaintiffs' objections have no basis in law or fact, and certainly do not show abuse of discretion. ......................... 27

A. Nothing in § 2 or the district court's order limits the State to creating majority-black districts within the unlawful, previous district lines. .................................. 28

B. The district court considered all relevant evidence...... 42

Conclusion ...................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
   585 U.S. 579 (2018) ................................................................ 45

*Alexander v. S.C. State Conf. of the NAACP,*
   144 S. Ct. 1221 (2024) ..........................................*passim*

*Allen v. Milligan,*
   599 U.S. 1 (2023) ................................................................ 20, 37

*Alley v. United States HHS,*
   590 F.3d 1195 (11th Cir. 2009) .................................... 14, 26, 42

*Baird v. Consol. City of Indianapolis,*
   976 F.2d 357 (7th Cir. 1992) .................................... 40

*Bethune-Hill v. Va. State Bd. of Elecs.,*
   580 U.S. 178 (2017) .................................... 21

*Bone Shirt v. Hazeltine,*
   461 F.3d 1011 (8th Cir. 2006) .................................... 14

*Bush v. Vera,*
   517 U.S. 952 (1996) ....................................15, 20, 21, 23

*Cave v. Singletary,*
   84 F.3d 1350 (11th Cir. 1996) .................................... 14, 26

*City of Mobile v. Bolden,*
   446 U.S. 55 (1980) .................................... 40

*Clark v. Calhoun County,*
   88 F.3d 1393 (5th Cir. 1996) .................................... 23

*Dillard v. Crenshaw County,*
   831 F.2d 246 (11th Cir. 1987) .................................... 29, 33, 45

*Godfrey v. BellSouth Telecoms.*,
    89 F.3d 755 (11th Cir. 1996) ..................................................... 14

*In re Clerici*,
    481 F.3d 1324 (11th Cir. 2007) ................................................. 42

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ........................................................... 34, 39

*Justice for All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) .................................................... 41

*Large v. Fremont County*,
    670 F.3d 1133 (10th Cir. 2012) ................................................. 14

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ................................................22, 29, 34, 39

*Luna v. County of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018)....................................... 30

*Maradiaga v. United States*,
    679 F.3d 1286 (11th Cir. 2012) ................................................. 36

*McGhee v. Granville County*,
    860 F.2d 110 (4th Cir. 1988) ........................................ 15, 22, 39

*Miller v. Johnson*,
    515 U.S. 900 (1995) ...................................................... 14, 15, 21

*Perry v. Perez*,
    565 U.S. 388 (2012) ............................................................... 45

*Rodriguez v. Bexar County*,
    385 F.3d 853 (5th Cir. 2004) .................................................... 14

*Rose v. Secr'y of State of Ga.*,
    87 F.4th 469 (11th Cir. 2023)................................................... 44

*Rucho v. Common Cause*,
  588 U.S. 684 (2019) ...................................................... 21, 22, 39

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1223 (11th Cir. 2005) ................................................. 44

*Seastrunk v. Burns*,
  772 F.2d 143 (5th Cir. 1985) ......................................... 21, 22, 42

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ...........................................................*passim*

*Shaw v. Reno*,
  509 U.S. 630 (1993) .................................................................... 32

*Tallahassee Branch of NAACP v. Leon County*,
  827 F.2d 1436 (11th Cir. 1987) ........................................... 14, 22

*Thompson v. Kemp*,
  309 F. Supp. 3d 1360 (N.D. Ga. 2018) ...................................... 30

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) .......................................................... 31, 38, 44

*United States v. Dallas County Comm'n*,
  850 F.2d 1433 (11th Cir. 1988) ........................................... 26, 33

*United States v. Euclid City Sch. Bd.*,
  632 F. Supp. 2d 740 (N.D. Ohio 2009) ...................................... 37

*United States v. Hays*,
  515, U.S. 737 (1995) ................................................................ 29

*Voinovich v. Quilter*,
  507 U.S. 146 (1993) .................................................... 22, 35, 42

*Wise v. Lipscomb*,
  437 U.S. 535 (1978) .................................................... 20, 41, 45

**Statutes**

52 U.S.C. § 10301..................................................................*passim*

# INTRODUCTION

The Supreme Court recently cautioned that "we must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024) (quotation omitted). This is exactly what Plaintiff-Appellants seek in this appeal—to commandeer the Voting Rights Act to achieve their political goals through the courts.

This case arises out of Plaintiffs' challenge to Georgia's 2021 redistricting. After the 2020 census, Georgia adjusted the electoral lines for its state and federal offices. Plaintiffs challenged those maps on the basis that they supposedly diluted black voters' political power, in violation of § 2 of the VRA. The district court agreed, holding that Georgia's maps needed additional majority-black districts and enjoining the use of the 2021 maps. The district court granted the State of Georgia time to produce remedial maps, provided they include two new majority-black state Senate districts in south metro Atlanta, along with five new majority-black state House districts in south metro Atlanta and elsewhere. Doc. 375 at 2–3.

Georgia did just that, producing maps with the additional majority-black districts in south metro Atlanta and other areas the district court had ordered.  Plaintiffs challenged those maps as well, but the district court—which, of course, had just a month earlier held that Georgia's original maps violated § 2—found that the remedial maps "fully complied with [its] order." *Id.* at 15.

The district court's decision was plainly correct, as Plaintiffs cannot even assert that Georgia failed to draw the required additional majority-black districts.  Instead, Plaintiffs complain that Georgia did not draw the districts in the ways *they* would have preferred—which, not coincidentally, would have been beneficial to Democrats, rather than Republicans.  Plaintiffs argue that the remedial districts were supposed to be drawn entirely within the lines of the former districts where the district court found vote dilution.  But there is no requirement—either in § 2 or in the district court's order—that a remedial map create additional majority-minority districts using only population from the specific districts challenged.  Vote dilution claims are based on regions, not district lines, and indeed, it would make no sense to limit a state legislature to drawing within lines that were just held to be illegal.  In any event, as the district court found, the additional majority-black districts *are* contained in whole or in

large part within the previous lines of the districts that Plaintiffs challenged.

Plaintiffs' arguments here do little more than establish that, much as the Secretary has maintained throughout this case, their real concern is *partisanship*, not actual racial vote dilution. Georgia produced additional majority-black districts just as the district court required, and Plaintiffs are still not happy, because they really want more *Democrat*-controlled districts. Plaintiffs' sour grapes do not undermine the district court's approval of the remedial plans.

And even if there were a dispute about the soundness of the district court's findings, this Court's review of the decision is subject to at least three layers of deference. State legislatures have considerable discretion in drawing remedial map lines. The district court's fact-findings are subject to abuse of discretion review. And the district court's understanding of its *own order* is subject to abuse of discretion review. There is perhaps no area where district courts are afforded more deference. This Court should affirm.

## STATEMENT OF THE CASE

Following the 2020 census, Georgia enacted new electoral districting maps. Plaintiffs challenged those maps under § 2 of

the Voting Rights Act, arguing vote dilution. The district court agreed and held that the State must create "two additional majority-Black Senate districts in south-metro Atlanta" and five additional majority-black state House districts in various regions around the state. Doc. 333 at 509. The state legislature subsequently adopted remedial maps that did exactly that. After the district court found the 2023 remedial plans "fully complied with [its] order," Doc. 375 at 15, Plaintiffs filed this appeal of the district court's remedial order.

## A. Factual background.

### 1. Georgia enacts new redistricting maps in the wake of the 2020 census.

On August 21, 2021, the Census Bureau released the population counts that Georgia and other states use to redraw their legislative districts. Doc. 270-5 at 20. Georgia then enacted new plans for federal and state legislative districts to comply with the new population requirements. That process included guidelines adopted before plans were drawn, public input through hearings, use of an online portal for voter comments, and education from a variety of groups. Doc. 333 at 40–44. Legislators began with "blind" legislative plans created by the Georgia legislature's mapdrawer, which were adjusted by each

committee chair.  *Id*. at 45–46.  The adopted 56-member Senate plan was drawn with low population deviations, 29 county splits, 14 majority-black districts, and it did not pair any incumbents running for reelection.  *Id*. at 54.  The adopted 180-member House plan was drawn with low population deviations, 69 county splits, 49 majority-black districts, and it paired four sets of incumbents from both political parties.  *Id*. at 57–58.

## 2.   Plaintiffs challenge Georgia's maps.

Plaintiffs, a group of Georgia voters and advocacy groups, challenged Georgia's new electoral maps under § 2, arguing that the maps diluted their votes.  Plaintiffs claimed Georgia failed to draw two majority-black Senate districts and three majority-black House districts in south metro Atlanta, focusing on the "areas" "in and around new Senate Districts 16 and 17."  Doc. 141 at ¶¶ 63–65, 69–72.  Plaintiffs also sought additional majority-black Senate and House districts in east Georgia, *id*. at ¶¶ 66, 73, "in the area in and around Macon-Bibb County," *id*. at ¶ 74, and "in the area around Columbus and Albany" in southwest Georgia, *id*. at ¶ 75.

After years of litigation and a trial, the district court issued its order on October 26, 2023, deciding that the configuration of several regions in the 2021 legislative and congressional plans

violated § 2.[1]  Doc. 333.  The court enjoined the use of those plans in their entirety and gave the Georgia General Assembly until December 8, 2023, to create remedial plans.  Doc. 333 at 510.

The district court gave specific instructions as to how to comply with its order: the new legislative plans had to include "two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb."  Doc. 333 at 509.  It also ordered that Georgia not "eliminat[e] minority opportunity districts elsewhere in the plans."  *Id.* at 510.  Beyond that, the court imposed no other "parameters [or] instructions."  *Id.* at 508.

### 3.  The legislature adopts remedial maps.

Governor Brian Kemp immediately called a special session of the state legislature to consider updated district boundaries.  Both houses of the legislature followed a careful process that aimed to comply with the district court's order while respecting traditional redistricting criteria like geography, keeping counties and municipalities whole, minimizing changes to existing district

---

[1] That order is on appeal before this Court in the consolidated cases 23-13914, 23-13916, and 23-13921.

boundaries, and maintaining the existing partisan balance of the state legislature.  *See, e.g.*, Doc. 369-3 at 8:17–22:24 (testimony of Senate Reapportionment and Redistricting Committee Chair); Doc. 369-4 at 18:22–26:12 (testimony of House Reapportionment and Redistricting Committee Chair).  Ultimately, the legislature adopted remedial maps that created two additional majority-black Senate districts and five additional majority-black House districts in the regions specified by the district court.

     a.   State Senate remedial plan

The Senate remedial plan increased the total number of majority-black districts by two and decreased the total number of majority-white districts by two.  Doc. 369-2, § 3.2.  The new majority-black districts are (a) District 17, which moves from 32.01% black voters[2] to 63.61% and (b) District 28, which moves from 19.51% black voters to 56.42%.  *Id.*

Both new majority-black Senate districts are located in south metro Atlanta—the region specified by the district court.  Indeed, the districts are all or mostly included within the borders of the previous districts that the district court found problematic.  The

---

[2] Percentages refer to "Any-Part Black Voting Age Population," the metric utilized by the district court.  *See* Doc. 333 at 32 n.14.

map below shows the previous Senate districts challenged by Plaintiffs (in green) and the two new districts (in grey):



2023 Remedial SDs–17 and 28 shown in grey
BVAP overlap: SD-17=56.8%, SD-28=100%

28

17

Note: 2021 Senate districts listed by the Court in ordering shown in green

Doc. 369-2, § 3.4, Figure 1.

The new Senate districts also closely resemble the illustrative districts submitted by Plaintiffs. Senate District 17, for example, contains nearly 80% of the total population that was included in the Esselstyn Illustrative Senate District 25. Doc. 369-2, § 3.5. That is no surprise since Senators consulted the illustrative plans drawn by Plaintiffs' experts, Mr. Cooper and Mr. Esselstyn. Doc. 369-3 at 8:23–9:2, 12:10–18, 13:20–14:3; *see also* Doc. 333 at 515

("[T]he General Assembly has an illustrative remedial plan to consult.").

Overall, the Senate remedial plan increases the number of black individuals of voting age who live in majority-black districts. On the 2021 Senate plan, 49.7% of black individuals of voting age in Georgia lived in a majority-black district. Doc. 369-2, § 3.3. On the Senate remedial plan, 53.5%% of black individuals of voting age in Georgia now live in a majority-black district. *Id.* Looking at just the districts the district court identified as indicating the general area of § 2 violations, the percentage of black individuals of voting age living in a majority-black district also increases on the Senate remedial plan. *Id.* at § 3.3.

### b.   State House remedial plan

The remedial state House plan increased the number of majority-black districts by five and decreased the number of majority-white districts by five. Doc. 369-2, § 4.2. The new majority-black districts are (a) District 64 (west metro Atlanta), which has 52.43% black voters; (b) District 74 (south metro Atlanta), which has 66.0%; (c) District 117 (south metro Atlanta), which has 62.93%; (d) District 145 (metro Macon), which has 50.30%; and (e) District 149 (metro Macon) which has 50.03%. *Id.*

On appeal, Plaintiffs challenge only the new Districts 74 and 117, in south metro Atlanta.[3] In crafting those districts, the House committee chair consulted the boundaries of the illustrative plans created by Plaintiffs' experts Mr. Cooper and Mr. Esselstyn. Doc. 369-4 at 21–23; *see also* Doc. 333 at 515. As a result, the new districts include much of the population from the districts Plaintiffs relied on at trial.

House District 74, for instance, contains 80.8% of the population that was included in Cooper Illustrative House District 74. Doc. 369-2, § 4.5, Table 12. The House committee chair specifically explained that he consulted the Plaintiffs' expert's district for that configuration. Doc. 369-4 at 21. Likewise, House District 117 includes nearly 70% of the population included in Esselstyn Illustrative House District 117. Doc. 369-2, § 4.5, Table 12.

---

[3] Plaintiffs admit that their objections in the district court did not challenge the configuration of House Districts 145 and 149, in the Macon area. *See* APA.Br.25 n.11; Doc. 375 at 11 n.5. Their brief also omits any mention of—and therefore forfeits any challenge to—House District 64. And the remedial congressional plan is the subject of a separate appeal and was not challenged by Plaintiffs in this case. *See* 11th Cir. Case No. 24-10231.

Districts 74 and 117 (shown in grey) are also located mostly within the lines of the former districts challenged by Plaintiffs (in green):



Doc. 369-2, § 4.5, Figure 4.

Overall, the House remedial plan increases the number of Black individuals of voting age who live in majority-black districts. On the 2021 House plan, 53.5% of black individuals of voting age in Georgia lived in a majority-black district. Doc. 326-2, § 4.3. On the House remedial plan, 56.6%% of black individuals of voting age in Georgia now live in a majority-black district. *Id*.

In looking at just the districts the Court identified as indicating the area of Section 2 violations, the percentage of black individuals of voting age living in a majority-black district increases dramatically, from 53.7% to 74.3%, under the House remedial plan. *Id.*

## B. The district court determines that the remedial maps "fully complied" with its order.

Although the remedial maps produced precisely the number of new majority-black districts required by the district court's order—and in the areas identified by the district court—Plaintiffs nevertheless challenged these maps as well. The district court set a schedule for consideration of objections from Plaintiffs to the plans. Doc. 348. After Plaintiffs filed objections, the Secretary responded, and the district court held an evidentiary hearing.

Plaintiffs' objections focused on the legislature adding new majority-black districts supposedly "anchored outside of the vote-dilution area." Doc. 354 at 6. Plaintiffs argued that Georgia failed to draw "two new majority-Black districts in the areas specified by the Court." *Id.* at 15. Their expert asserted that the "task for the remedial map drawer is to stay *inside* the . . . vote dilution area to the extent practicable." Doc. 354-1 at ¶¶ 11, 34.

At the hearing, Plaintiffs continued their argument, claiming the new plans had to draw new majority-black districts "in the area where the vote dilution was identified." Doc. 372 at 66; *see also id*. at 88–89. Plaintiffs complained that there were "no new opportunities for Black Georgians in the vote dilution area." *Id*. at 81.

The district court rejected Plaintiffs' argument. The district court issued its remedial order, which is the subject of this appeal, finding "that the General Assembly fully complied with this Court's order requiring the creation of Black-majority districts in the regions of the State where vote dilution was found." Doc. 375 at 15. The district court specifically rejected Plaintiffs' argument that Georgia was confined to drawing new majority-black districts entirely within the confines of the districts it had listed as dilutive in its order. *Id*. at 8. As the court explained, it identified specific districts to establish the general *areas* where vote dilution had occurred, not to limit the discretion of the legislature in placing districts in those areas. *Id*. at 8–10. The court then specifically found that the new districts were added in the regions identified by the court. *Id*. at 10–15.

### C. Standard of review.

The district court's order on remedial redistricting plans is reviewed for abuse of discretion. *Godfrey v. BellSouth Telecoms.*, 89 F.3d 755, 757 (11th Cir. 1996); *see also Large v. Fremont County*, 670 F.3d 1133, 1139 (10th Cir. 2012); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1017 (8th Cir. 2006); *Rodriguez v. Bexar County*, 385 F.3d 853, 870 (5th Cir. 2004). This is especially true when evaluating a legislatively enacted redistricting plan because it is the product of a "complex interplay of forces" and "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995). And "[a] reapportionment plan enacted by a state legislative body . . . is not scrutinized by the exacting standards used in evaluating a judicially imposed plan." *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438 (11th Cir. 1987).

Further, the order on the remedial redistricting plans involves a district court interpreting its own order, which is also reviewed for abuse of discretion. *Alley v. United States HHS*, 590 F.3d 1195, 1202 (11th Cir. 2009) (citing *Cave v. Singletary*, 84 F.3d 1350, 1354–55 (11th Cir. 1996)).

## SUMMARY OF ARGUMENT

The question on appeal is whether the district court abused its discretion when it found that Georgia's remedial redistricting maps complied with the district court's own order. It plainly did not. Plaintiffs' various arguments to the contrary are at times hard to even follow, and they come nowhere close to identifying any abuse of the district court's broad discretion.

**I.** "Redistricting constitutes a traditional domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233; *see also Bush v. Vera*, 517 U.S. 952, 978 (1996). Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller*, 515 U.S. at 915–16. And "[i]nherent in any redistricting remedy" is the reality that some voters will be in districts where they are part of a political minority. *McGhee v. Granville County*, 860 F.2d 110, 118 n.9 (4th Cir. 1988). The State need not "draw the precise compact district that a court would impose in a successful § 2 challenge." *Vera*, 517 U.S. at 977–78 (quotation omitted).

That is why, here, the district court ordered the creation of majority-black districts in south metro Atlanta but *did not* order any particular lines or limit the State's ability to otherwise draw the districts as it saw fit. The district court identified the *regions*

where the additional majority-black districts must be, but it did not purport to go any further. Doc. 333 at 509.

Georgia's remedial maps satisfy the district court's order. The order required the State, as relevant here, to create two additional majority-black Senate districts and two additional majority-black House districts in the south metro Atlanta area, without removing any existing majority-black districts. Doc. 333 at 509–10. That is precisely what Georgia did: Senate Districts 17 and 28, as well as House Districts 74 and 117, are new majority-black districts in the south metro Atlanta area, and Georgia did not eliminate any existing majority-black districts.

If nothing else, the district court did not *abuse its discretion* in making that finding. Even if it were debatable whether the districts are in south metro Atlanta (although they plainly are), this is exactly the sort of on-the-ground factual question that is within the ken of the district court.

**II.** Plaintiffs' counterarguments are unclear, mistaken, irrelevant, or some combination of the above.

**A.** Plaintiffs' primary argument seems to be that Georgia was required to create new majority-black districts entirely within what they call the "vote dilution area"—the specific districts they challenged. Doc. 354 at 13–25; APA.Br.37–42. But there is no

authority for that anywhere: § 2 is based on a regional inquiry, not a district-by-district inquiry, and it would make no sense at all to confine a State's new districts to the same exact lines that were just held unlawful.

Plaintiffs point to a few cases for the proposition that a State cannot remedy a § 2 violation by creating a majority-minority district in a totally different part of the state, but that is irrelevant. APA.Br.34. Georgia created majority-black districts in precisely the area the district court told it to. Cases like *Shaw v. Hunt*, 517 U.S. 899 (1996), merely make the point that you could not create a non-compact majority-black district in Savannah to remedy a § 2 problem in Atlanta.

Seemingly aware that the argument they have traveled with thus far—the new districts must be entirely within the old districts—does not work, Plaintiffs try a number of unclear variations on that theme. They seem to argue, at various points, that Georgia was required to include as many black voters from the challenged districts as possible, or that Georgia has not remedied the harm if any black voters remain in white-majority districts, or that Georgia cannot dismantle Democrat-leaning, white-majority districts as it creates the new majority-black districts. APA.Br.37–47.

But none of these arguments have any basis. The Supreme Court has specifically rejected the notion that a voter "has the right to be placed in a majority-minority district once a violation of the statute is shown." *Shaw*, 517 U.S. at 917 n.9. By definition, there will *always* be voters who are part of a political minority (and racial minority) in some districts. Where § 2 requires the creation of majority-minority districts, that is *all* it requires. It does not also require that Georgia *pack* as many black voters into the districts as possible or choose to drown out Republican votes in the new districts.

Anyway, even if Plaintiffs' arguments had merit to them (and they don't), the district court *did not order* any of the relief that Plaintiffs now assert an entitlement to. And Plaintiffs did not cross-appeal the district court's original order. It is too late now to relitigate the underlying merits and remedial requirements.

**B.** Plaintiffs scatter a few other arguments about, mainly accusing the district court of abusing its discretion by not giving enough weight to certain evidence. APA.Br.43–52. But the district court examined the evidence that Plaintiffs put forward and found that it was insufficient to establish that the State had failed to comply. And where the district court rejected reliance on certain evidence—like Plaintiffs' illustrative maps—it was right to

do so.  Plaintiffs' illustrative maps have no power over Georgia or the district court; Georgia *did* consider the versions presented at trial and in fact its districts cover much of the same territory, but even if it had not, that would be no problem at all.  The question is whether Georgia's remedial maps comply with the district court's order, not whether they resemble Plaintiffs' preferences.

At the end of the day, this entire dispute comes down to *political* preference.  Plaintiffs wanted the State to shift district lines in ways that would benefit Democrats, and the State instead chose to benefit Republicans.  Plaintiffs got what they were entitled to (new majority-black districts); they have no claim to what they want (new majority-Democrat districts).  This Court should affirm.

## ARGUMENT

### I.   The remedial maps complied with the district court's order.

The district court's relevant remedial instructions in this case were simple.  It required the creation of two additional majority-black Senate districts and two additional majority-black House districts in the south metro Atlanta area.  Doc. 333 at 509.  It also ordered that Georgia not "eliminat[e] minority opportunity

districts elsewhere in the plans." *Id.* at 510. Beyond that, the court imposed no other "parameters [or] instructions." *Id.* at 508.

The State's remedial maps satisfy the district court's order. Remedial Senate Districts 17 and 28 and remedial House Districts 74 and 117 are new majority-black districts in the south metro Atlanta area. Doc. 375 at 10–12; *see also id.* at 15 (finding that the General Assembly created the required districts "in the regions of the State where vote dilution was found"). And the State did not eliminate any majority-black districts "elsewhere in the plans" to reach that result. Doc. 333 at 510.

Of course, Plaintiffs may prefer different remedial maps. But States have broad discretion in crafting remedial districts, and federal courts should not "conduct a beauty contest between plaintiffs' maps and the State's." *Allen v. Milligan*, 599 U.S. 1, 21 (2023) (quotation omitted and alteration adopted). As long as the State's remedial maps complied with the district court order and do not themselves violate § 2, they are sufficient. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (lead op.).

**1.** As the Supreme Court reiterated this past term, "[r]edistricting constitutes a traditional domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233; *see also Vera*, 517 U.S. at 978 (the State has a "sovereign interest in implementing its

redistricting plan"). Drawing electoral districts is a complicated process that requires balancing a wide array of sometimes conflicting factors: preserving county and municipal boundaries, adhering to natural geography, keeping communities of interest intact, and designing compact and contiguous districts. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 183 (2017) (describing these "traditional redistricting factors"); *Vera*, 517 U.S. at 1048 (Souter, J., dissenting) (collecting cases that "accorded substantial respect" to the States' reliance on such factors). It is also "an inescapably political enterprise." *Alexander*, 144 S. Ct. at 1233. Legislatures are "almost always aware of the political ramifications of the maps they adopt," and they are free to consider partisan interests—protecting incumbents or conferring advantages to one party over another—when redistricting. *Id.* at 1233, 1235; *see also Rucho v. Common Cause*, 588 U.S. 684, 706– 07 (2019).

Striking the right balance in this "complex interplay of forces" is a fundamentally legislative task. *Miller*, 515 U.S. at 915–16; *Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy."). Federal courts, by contrast, have no "legal standards" to evaluate such policy-laden judgments. Doc. 375 at 15 (citing *Rucho*, 139 S.

Ct. at 2507; *Seastrunk*, 772 F.2d at 151).  Which is why, "time and again," the Supreme Court has instructed that, absent a violation of federal law, federal courts must defer to a state legislature's redistricting choices.  *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993); *see also, e.g.*, *Tallahassee Branch of NAACP*, 827 F.2d at 1438; *Seastrunk*, 772 F.2d at 151.  States, in other words, are entitled to "broad discretion in drawing districts to comply with the mandate of § 2." *Shaw*, 517 U.S. at 917 n.9.

That is especially true when, as here, the parties do not dispute *whether* a new district must be drawn, only what the precise boundaries of that new district should be.  Redistricting, after all, is an "inevitably rough-hewn" and "approximate" process. *McGhee*, 860 F.2d at 119.  Creating new districts logically requires adjustments to adjacent districts.  And the competing factors at play in the redistricting calculus (geography, local government boundaries, partisan interests) mean that some voters will invariably be left in districts where they are part of the political minority.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 503–04 (2006) (Roberts, C.J., concurring) (*LULAC*).  That is "[i]nherent in any redistricting remedy." *McGhee*, 860 F.2d at 118 n.9.  The district court made that same observation in this case. *See* Doc. 375 at 13–14 (some "members of the minority group" will

inevitably end up "outside of the [new] minority-controlled districts.").

Federal courts, therefore, do not delineate the specific boundaries of the remedial districts States must create to cure a § 2 violation. *See Vera*, 517 U.S. at 977–78 (the State need not "draw the precise compact district that a court would impose in a successful § 2 challenge" (quotation omitted)); *Clark v. Calhoun County*, 88 F.3d 1393, 1407 (5th Cir. 1996) ("[The State] is free … to develop a different remedial plan from those proposed by the plaintiffs."). Of course, the district court must identify the region in which vote dilution has been found and the remedial district should be located, but it cannot "confine the General Assembly to working only within [certain] enumerated districts." Doc. 375 at 9.

In sum, then, upon a finding of vote dilution, States are free to adopt *any* remedial map, as long as that map complies with the district court order and does not independently violate § 2.

**2.** The State's remedial map plainly satisfies that standard. To reiterate, the district court's order, as relevant here, required Georgia to create two additional majority-black Senate districts and two additional majority-black House districts in the south metro Atlanta area. Doc. 333 at 509. And that is *all* it required.

It did not specify exactly where in south metro Atlanta the new districts must be placed or exactly which of the *existing* districts must be adjusted to accommodate the new districts.

Remedial Senate Districts 17 and 28, and remedial House Districts 74 and 117, are all located within the south metro Atlanta area. They are all based in counties—Henry, Clayton, Douglas, and Fulton—in the south metro Atlanta area. Doc. 333 at 34–35, 146, 152. Notably, although the General Assembly was not required to create the new districts within the specific districts held to be problematic, the remedial districts largely overlap with those boundaries.



Doc. 369-2, § 3.4, Figure 1.



Doc. 369-2, § 4.5, Figure 4.

There is nothing else the legislature was required to do. The district court's post-trial order found that the State's 2021 legislative maps diluted the votes of black voters because the south metro Atlanta area could, but did not, include additional majority-black Senate and House districts. Doc. 333 at 508–09. The remedial maps "completely remed[y]" that issue by adding the required majority-black Senate and House districts. *United States v. Dallas County Comm'n*, 850 F.2d 1433, 1437–38 (11th Cir. 1988) (quotation omitted).

**3.** Even if the correct finding were arguable, the Secretary prevails anyway because the district court *found* the State's remedial maps "fully compl[y]" with its order. Doc. 375 at 15. Its instruction to create new majority-black districts in "south-metro Atlanta," explained the court, "did not … confine the General Assembly to working only within the" previous district lines identified as vote-dilutive. *Id.* at 9–10. Rather, that instruction was "geographic guidance" indicating the general area in which the new districts should be placed. *Id.* And the remedial maps followed that guidance. *Id.* at 15 (finding the State created the new districts "in the regions of the State where vote dilution was found").

A district court's interpretation of its own order is reviewed with significant deference. *Alley*, 590 F.3d at 1202. The district court, after all, "is in the best position to interpret its own orders." *Id.* (quotation omitted). As long as its reading is "reasonable," the decision will stand. *Cave*, 84 F.3d at 1354. And no one could seriously maintain that it was unreasonable for the district court to interpret "south-metro Atlanta," Doc. 333 at 509, to mean the "regio[n]" of "south-metro Atlanta" rather than an arbitrary collection of specific legislative districts within that region drawn from Plaintiffs' complaint, Doc. 375 at 8–10.

Plaintiffs briefly argue that the "undisputed evidence show[ed] that the number of Black-majority districts in South Metro Atlanta remained stagnant" on the remedial plans, APA.Br.43, but that is nonsense. The district court specifically *found the opposite*. Doc. 375 at 10–11. And the question whether the districts are in fact located in a particular area is precisely the sort of factual question where the district court receives deference. Even if someone might disagree about *precisely* where south metro Atlanta is (and here there should not be much disagreement), the district court's finding on that point must be respected.

Simply put, Georgia complied with the district court's order, the district court found that Georgia complied with the order, and even if one disagreed with those conclusions, it was not an abuse of discretion for the district court to so find.

## II. Plaintiffs' objections have no basis in law or fact, and certainly do not show abuse of discretion.

Plaintiffs, for their part, argue that Georgia's remedial discretion is much more limited. They would require the State to create additional majority-black districts using *only* the population from the specific districts—what Plaintiffs call the "vote-dilution area"—identified in the district court's initial order. *See, e.g.*, APA.Br.17–18, 24–25, 28, 42, 46–47. But as the district

court observed, there is "no relevant authority to support this view." Doc. 375 at 8. Indeed, as the district court explained, it developed its list of districts by looking to those challenged in Plaintiffs' complaint, *see* Doc. 375 at 8–9; Doc. 333 at 512 n.138, and it used the district numbers just to indicate the general "area" of vote dilution, not to specify precise boundaries for the new majority-black districts, *contra* APA.Br.8–10.

At bottom, Plaintiffs' arguments do little more than establish that their real concern is partisanship, not race-based vote dilution. The remedial maps create additional opportunities for black voters to elect their preferred representatives from majority-black districts, just as the district court required, but Plaintiffs are not satisfied because they would prefer more *Democrat*-controlled districts. Section 2, however, does not place a thumb on the scale for one political party over another.

### A. Nothing in § 2 or the district court's order limits the State to creating majority-black districts within the unlawful, previous district lines.

Plaintiffs repeatedly insist that the new majority-black districts created by the General Assembly are insufficient because some of them are not contained entirely within the "vote-dilution area." *See, e.g.*, APA.Br. 17–18, 24–25, 28, 42, 46–47. On

Plaintiffs' view, a vote dilution remedy is "complete" only if the new majority-black districts are comprised of voters who previously resided in the districts held unlawful. APA.Br.38–42. But that is not what § 2 requires.

**1.** A State's remedial choice is sufficient as long as it "remed[ies] the [identified] Section 2 violation," *Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987), and ensures that minority voters have equal "opportunity … to elect representatives of their choice," 52 U.S.C. § 10301(b). The State's remedial map accomplished that by adding the required majority-black districts in the required regions.

That § 2 is concerned with *regions* and not particular *districts* is obvious in how § 2 vote dilution claims work. Unlike racial gerrymandering claims, which challenge specific district boundaries, *see United States v. Hays*, 515 U.S. 737, 745 (1995), vote dilution claims do not challenge the boundaries of any particular electoral district. Instead, they challenge the lack of majority-minority districts in the "area *as a whole*." *LULAC*, 548 U.S. at 504 (Roberts, C.J., concurring in part and dissenting in part) (emphasis added). In fact, a vote-dilution plaintiff doesn't even have to live in a particular district to bring such a claim; he need only live in "a reasonably compact *area* that could support

additional majority-minority districts." *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018) (three-judge court) (emphasis added and quotation omitted); *see also Luna v. County of Kern*, 291 F. Supp. 3d 1088, 1122 n.14 (E.D. Cal. 2018) (collecting cases). By the same token, to *remedy* vote dilution, the State need not adjust or be confined to the boundaries of any particular districts; it simply must ensure that the identified *area* has the required number of majority-minority districts.

Plaintiffs' argument to the contrary lacks authority or even common sense. They insist that the State must confine its remedial districts to the vote dilution area identified in the court order. But the boundaries of that "vote dilution area" were set by a map that the district court held to be illegal—at Plaintiffs' own insistence. Doc. 333 at 511–14. Why should the State, or any remedial map-drawer, be required to use, as a template for designing new districts, an unlawful map? Indeed, Plaintiffs' own illustrative maps include remedial districts that extend beyond the vote dilution zone. Doc. 369-2 at 32.

Plaintiffs erroneously argue that *Shaw*, 517 U.S. at 899, requires States to remedy vote dilution by adjusting the particular electoral districts identified by a district court. *See* APA.Br.33–35. But the decision says nothing of the sort. For one thing, *Shaw*

was not even a § 2 case; it was a racial gerrymandering case. The Department of Justice refused to preclear North Carolina's redistricting map under § 5 of the Voting Rights Act. The proposed map, said DOJ, diluted minority voting strength in the south-central to southeastern portions of North Carolina, in violation of § 2. North Carolina responded by revising the proposed map to include a new, plainly gerrymandered majority-black district. 517 U.S. at 917. The Court rejected the argument that this supposed attempt at compliance with § 2 could justify the obvious racial gerrymander. For one, the district was not remotely compact, and § 2 requires creation of majority-minority districts only where they could be compact. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). For another, its proposed district was nowhere near the area of supposed vote-dilution concern, nor could it be because it was so strung out it was not limited to any particular region at all:



APPENDIX
NORTH CAROLINA CONGRESSIONAL PLAN
Chapter 7 of the 1991 Session Laws (1991 Extra Session)

*Reproduced at Shaw v. Reno*, 509 U.S. 630, 659 (1993) (red line added for emphasis); Doc. 369 at 35. So the "black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before District 12 was drawn." *Shaw*, 517 U.S. at 917. That, explained *Shaw*, was not a valid remedy for feared vote dilution; the State could not fix vote dilution in one part of the State by creating a new majority-minority district on the other side of the State. *Id.*

This case is the polar opposite of *Shaw*. The remedial districts adopted by the General Assembly here are not non-compact districts that stretch to the other side of the State. Quite the opposite: they are compact and contained within south metro

Atlanta.  That is exactly the kind of remedy *Shaw* says § 2 requires.  *See id.* at 917–18 (explaining that vote dilution is cured when the remedial district includes a "substantial portion" of the affected minority voters).

Next, Plaintiffs turn to the wholly inapposite *Dallas County*, 850 F.2d at 1433.  *See* APA.Br.35–37.  The plaintiffs there challenged the County's use of at-large elections for its commission and school board.  850 F.2d at 1435.  After the district court found that the at-large system diluted black voting power, it imposed a modified system that included four single-member districts (two majority-white and two majority-black) but retained one at-large seat.  *Id.* at 1438.  But this Court vacated the district court's hybrid remedy because it retained an at-large seat functionally inaccessible to black voters—the very thing that had led to a finding of vote dilution in the first place.  *See id.* at 1440 (explaining that the plan "perpetuate[d] rather than ameliorate[d]" the problems of the old system).  And "any proposal to remedy a Section 2 violation must itself conform with Section 2."  *Id.* at 1437–38 (quoting *Dillard*, 831 F.2d at 249).

Needless to say, this case is distinct from *Dallas County*. Here, Plaintiffs do not challenge the use of an at-large election scheme; they take issue with the specific configuration of single-

member districts chosen by the Georgia legislature. That is a much harder argument to make: "When the question … comes down to the reasonableness of drawing a series of district lines in one combination of places rather than another, judgments about inequality may become closer calls." *Johnson v. De Grandy*, 512 U.S. 997, 1013 (1994). And Plaintiffs here, unlike in *Dallas County*, do not argue that the remedial maps adopted by the Georgia legislature continue to dilute minority votes. To the contrary, Plaintiffs have not offered any alternative remedial plans with more majority-black districts in the vote dilution areas. Their own expert's map has the *same* number of new majority-black districts in south metro Atlanta as the legislature's maps. *See* Doc. 354-1, ¶¶ 14, 33; Doc. 355, Ex. I.

Plaintiffs argue that a state "may not trade off the rights of some against the rights of others," APA.Br.33 (quotation omitted), which is true enough but irrelevant here. Georgia could create only so many majority-black districts (which it did), and it had to leave certain black voters out of those districts. Plaintiffs wanted *different* black voters left out of the districts as a matter of partisan preference, but "[i]f the inclusion of [certain voters] would necessitate the exclusion of others, then the State cannot be faulted for its choice." *LULAC*, 548 U.S. at 429–30.

So even as Plaintiffs purport to acknowledge that States have leeway when redrawing districts to remedy vote dilution, *see* APA.Br.36, they would arbitrarily limit the state legislature's discretion. But absent a choice that is illegal under federal law, States have the authority to craft any new remedial districts they want. *Voinovich*, 507 U.S. at 156. Here, the State placed the new majority-black districts where the district court ordered them, and that should be the end of it.

**2.** At times, Plaintiffs seem confused about their own argument. From their objections in district court on, their consistent position has been that Georgia's remedial districts must remain within the boundaries of the "vote-dilution zone" identified by the district court. *See* Doc. 372 at 71:13–72:19, 80:22–81:9, 87:23–88:19, 91:9–15, 93:1–2. Indeed, the district court specifically rejected that argument. Doc. 375 at 8. Now Plaintiffs claim that they argue something else entirely, a position difficult to square with all their representations up to now. *See* APA.Br.49. It is far too late to come up with a new argument on appeal. *See Maradiaga v. United States*, 679 F.3d 1286, 1293 (11th

Cir. 2012) (explaining that arguments are forfeited if not raised before the district court).[4]

But assuming for the moment that Plaintiffs made (or are making) a different argument, it is unclear what its contours are. Potentially, Plaintiffs argue that remedial districts can extend beyond the challenged districts, but not *too much*.  *See, e.g.*, APA.Br.35 n.12, 37, 49.  That is somewhere close to the truth, although the focus should remain on the region, not the specific district lines.  *See Shaw*, 517 U.S. at 917–18 (remedial districts need only include a "substantial portion" of the affected area).  But if that is Plaintiffs' position, then the remedial maps at issue here

_____

[4] Plaintiffs protest that they never argued that all new majority-black districts must be drawn within the previous lines of the challenged districts.  APA.Br.28, 37, 49.  But they cite a few solitary lines of argument at the hearing that addressed only prior Senate District 42.  Doc. 372 at 79:20–24.  Plaintiffs were discussing only whether a single district that had been modified by the legislature north of their "vote dilution area" mattered, not whether the legislature was limited to particular districts. The district court, for its part, understood Plaintiffs to be arguing that map drawers must stay within the lines of the challenged districts, Doc. 375 at 8, for the plain reason that Plaintiffs repeatedly relied on that argument, Doc. 354 at 6, 11, 15; Doc. 354-1 at ¶¶ 11, 34.  Even now, as they purport to move away from that argument, the foundation of Plaintiffs' claim still appears to be that the State was not supposed to go outside of the challenged district lines.

could not be insufficient because they do overlap entirely or in substantial part with the challenged districts, as the district court found. Doc. 375 at 10–13. The State's remedial maps mostly overlap with even the *Plaintiffs'* proposed maps. *See* Doc. 369-2 at §§ 3.5, 4.5. And in any event, disputes about the minor differences in the maps would not matter on appeal—the district court found the State's maps sufficient and did not abuse its discretion in making that finding.

Alternatively, Plaintiffs appear to contend that a remedial map complies with § 2 only if it places as many minority voters as possible within majority-minority districts. *See* APA.Br.50–51. But States' broad mapmaking discretion would mean nothing if the only "lawful" map is whichever map places the most minority voters in majority-minority districts. Moreover, Plaintiffs' argument would invite federal courts to engage in exactly the kind of "beauty contest"—comparing a State's remedial map and a plaintiff's proposed map—that the Supreme Court rejected just last term in *Milligan*, 599 U.S. at 21; *see also United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) ("[A] court is not to inquire whether the defendants have proposed the very best available remedy, or even … an appealing one."). Not to mention that requiring as many black voters as possible in

a district would seem to be a clear case of "packing" minority voters into a few districts that would limit their power elsewhere.

In a related argument, Plaintiffs mistakenly insist that the State's maps are unlawful because they do not remedy the "harm" of vote dilution for every affected voter. *See, e.g.*, APA.Br.2, 32–33, 35, 49. In other words, some voters in the vote dilution area who were previously in majority-white districts remain in majority-white districts. *Id.* But that will always be the case, and a voter is not injured simply because he lives in a district where he is part of the political minority. He can be harmed, and vote dilution can occur, only if he lives in an unfavorable district *and* he is part of a minority group large and compact enough to form an additional majority-minority district that the State has neglected to draw. *See Gingles*, 478 U.S. at 48–51. If the State has already drawn as many majority-minority districts as the district court held § 2 to require—which the remedial maps here accomplish—then there is no vote dilution.

The Supreme Court has specifically rejected Plaintiffs' argument that § 2 requires placing specific voters in majority-minority districts. In *Shaw*, the Court explained that no one, including a successful § 2 plaintiff, "has the right to be placed in a majority-minority district once a violation of the statute is shown."

517 U.S. at 917 n.9. And that makes sense because *no map* could place every voter in a district where their preferred candidate is guaranteed to win. Inevitably, some voters will be left in districts where they are part of the political minority. *LULAC*, 548 U.S. at 503–04 (Roberts, C.J., concurring); *see also De Grandy*, 512 U.S. at 1015 ("[S]ome dividing by district lines … is virtually inevitable and befalls any population group of substantial size."); *McGhee*, 860 F.2d at 118 n.9 ("Inherent in any redistricting remedy … is the possibility … that not all can be placed in safe districts."). Especially when other considerations—like geography, county and municipal boundaries, or partisan interests—come into play. *See Alexander*, 144 S. Ct. at 1233, 1235; *Rucho*, 588 U.S. at 706–07 (legislature is free to consider partisan interests).

Finally, Plaintiffs seem to argue that minority voters are entitled not only to additional *majority-minority* districts, but also additional districts wherein their preferred candidates are elected. APA.Br.32–33. In other words, if black voters prefer Democrats, the State must not only create more majority-black districts but also create additional majority-*Democrat* districts. Of course, Plaintiffs have no authority for this remarkable argument, and their attempt even to state the proposition borders on nonsensical, declaring that voters must have new opportunities for voters. *See*

39

*id.* at 32 ("A Section 2 remedy must provide injured voters with new opportunities for minority voters to elect candidates of their choice."). Section 2 does *not* require that minority voters gain additional Democrat-leaning districts—it is directed toward injuries "on account of race," not partisanship. 52 U.S.C. § 10301(a); *see also, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 109 (1980) (Marshall, J., dissenting) (there is no injury where "community's lack of success at the polls was the result of partisan politics"); *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (Section 2 "does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates."). Section 2 at times requires additional *majority-minority* districts, which is exactly what the State provided here. It does not require additional districts of a particular partisan lean.

**3.** Regardless, even if one were sympathetic to Plaintiffs' arguments about what the district court *should have* required, none of this is what the district court ordered. The district court clearly outlined "the parameters and the instructions around what the State of Georgia [was] supposed to do" to cure supposed vote dilution in south metro Atlanta. Doc. 333 at 508–09. The court required "two additional majority-Black Senate districts" and "two

additional majority-Black House districts in south-metro Atlanta." *Id.* at 509. It also acknowledged the State's discretion in crafting appropriate remedial maps, noting that "redistricting … is a legislative task." *Id.* (quoting *Wise*, 437 U.S. at 539). And it specifically *declined* to delineate exactly where and with which voters the remedial districts must be drawn. *Id.* (explaining that it would be "[in]appropriate … for the federal court to devise its own plan" (quoting *Wise*, 437 U.S. at 540 (alteration adopted))).

In other words, the district court *did not* order the relief Plaintiffs now argue for. The district court then went on to again explain that it did not order such relief. *See, e.g.*, Doc. 375 at 8, 14 ("reject[ing]" Plaintiffs' "foundational assumption" that "the State was confined to making changes only in [specific] districts").

If Plaintiffs were unhappy with the district court's order, or if they thought it did not conform to the requirements of § 2, then they could have cross-appealed and asked this Court to modify the order. But Plaintiffs chose not to do so. Thus, even if they were somehow correct—and they are not—that the district court *should have* imposed stricter limits on the State's remedial discretion, that argument is beyond the scope of this appeal. *See Justice for All v. Faulkner*, 410 F.3d 760, 772 (5th Cir. 2005) ("Because [the plaintiff] did not cross-appeal from the district court's judgment,

however, we lack jurisdiction to expand the scope of the remedy ordered.").

## B. The district court considered all relevant evidence.

Finally, Plaintiffs assert that the district court abused its discretion by supposedly failing to consider relevant evidence or affording too much weight to "minimally relevant considerations." APA.Br.43. But Plaintiffs are grasping at straws. Abuse of discretion is an "extremely limited and highly deferential" standard of review. *In re Clerici*, 481 F.3d 1324, 1331 (11th Cir. 2007) (quotation omitted). And here, that review is triply deferential because the district court was itself required to "defer to [the General Assembly's] legislative judgment" on remedial maps, Doc. 375 at 15 (quoting *Seastrunk*, 772 F.2d at 1541); *see also Voinovich*, 507 U.S. at 156–57, and the district court was interpreting its own order, *Alley*, 590 F.3d at 1202.

Regardless, the district court *did* consider Plaintiffs' evidence. The district court considered, in detail, "whether the 2023 Remedial Plans remedy the Section 2 violations … in the areas identified by the Court." Doc. 375 at 7; *contra* APA.Br.43. It required the Secretary to show, and found that he *did* show, that the new maps "completely remedy the prior dilution of minority voting strength and fully provide equal opportunity for minority

citizens." Doc. 375 at 7, 15 (quotation omitted and alteration adopted).

The district court explicitly considered the adequacy of the boundaries of the remedial districts, overlaying them on top of the "vote dilution area" (i.e., the dilutive districts) identified in its initial order. *See* Doc. 375 at 10–13. It found that the remedial Senate districts are "wholly" or "nearly contained" within the area. *Id.* at 10. Likewise, it found that the remedial House districts "significantly overlap" with the "districts enumerated in the Court's [initial] order." *Id.* at 11–12. The district court also considered the portion of black voting-age population in each remedial district drawn from the challenged districts. *Id.* at 11–13. Based specifically on this information, the district court concluded that the remedial maps "fully complied" with its order "requiring the creation of Black-majority districts in the regions … where vote dilution was found." *Id.* at 15.

In other words, the district court considered the evidence at the core of Plaintiffs' argument; it just rejected Plaintiffs' view of that evidence. Of course, Plaintiffs are free to disagree with the district court's conclusions, but a reviewing court "will not" find abuse of discretion even if it "might have reached a different

decision." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

In their last gambit, Plaintiffs argue that the district court abused its discretion when it declined to compare the legislature's remedial maps to Plaintiffs' illustrative plans. APA.Br.48–49; Doc. 375 at 14. But this argument is both legally and factually flawed.

First, Plaintiffs misunderstand the role of illustrative plans in a § 2 vote dilution claim. To prevail on such a claim, a plaintiff must—at the *merits* stage—produce an illustrative map with more majority-minority districts than the State's map. *See Rose v. Secr'y of State of Ga.*, 87 F.4th 469, 475 (11th Cir. 2023) (collecting cases). That's how the plaintiff shows that minority voters have "the *potential* to elect [more] representatives in the absence of the challenged" map. *Gingles*, 478 U.S. at 50 n.17. But illustrative maps have little function at the remedial stage because, once the plaintiff has proven that an additional majority-minority district need be drawn, it is up the legislature to determine exactly *how* and *where* to create the district. Plaintiffs have no necessary role to play in drawing new maps.

"Redistricting," after all, "is 'primarily the duty and responsibility of the State.'" *Perry v. Perez*, 565 U.S. 388, 392

(2012) (quotation omitted).  Only the state legislature can properly account for "the complex interplay of forces" that bear on the "redistricting calculus."  *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (quotation omitted).  And the State is entitled to a "presumption of legislative good faith."  *Id.*  So the legislature must be given "a reasonable opportunity … to meet" the requirements of § 2 with its own remedial map before "the federal court … devise[s] and order[s] into effect its own plan."  *Wise*, 437 U.S. at 540.  The only requirement is that the new map not *itself* violate the terms of § 2.  *See Dillard*, 831 F.2d at 252–53 (the remedial map must "remedy the Section 2 violation"); *Wise*, 437 U.S. at 540 ("The new legislative plan … will then be the governing law unless it, too, is … found to violate [federal law].").

Second, even assuming the district court should have compared the legislature's remedial maps against Plaintiffs' illustrative maps, that does not help Plaintiffs' case.  Both the legislature's maps and Plaintiffs' maps add two new majority-black Senate districts and two new majority-black House districts in south metro Atlanta.  Doc. 354-1, ¶¶ 14, 33; Doc. 355, Ex. I.  Indeed, the legislature's remedial districts and Plaintiffs' illustrative districts overlap substantially.  The population in each

remedial district corresponds to at least half of the population in a corresponding illustrative district:

| Remedial District | Illustrative District | % Total Population in Remedial District from Illustrative Plan | % Total BVAP in Remedial District from Illustrative Plan |
|---|---|---|---|
| SD-17 | Esselstyn SD-25 | 78.6% | 76.6% |
| SD-28 | Esselstyn SD-35 | 52.6% | 55.8% |
| HD-74 | Cooper HD-74 | 80.8% | 81.8% |
| HD-117 | Esselstyn HD-117 | 69.2% | 70.2% |

Data from Doc. 369-2, §§ 3.5, 4.5.

Just because Plaintiffs prevailed in establishing a § 2 violation does not mean they have any special privilege to guide the remedy. The legislature need not consult their maps (though it did), and the district court need not consult their maps. Map drawing is the responsibility of the State, and unless it fails to follow the district court's order, that is the end of it. Here, Plaintiffs have hardly even *tried* to identify any way in which the State failed to comply with the district court's order, as the district court itself found. The district court was plainly correct when it declined "Plaintiffs' invitation to compare the 2023 Remedial Plans with plans preferred by Plaintiffs and crown the illustrative plans the winners." Doc. 375 at 14.

# CONCLUSION

This Court should affirm the judgment below.


Respectfully submitted.

August 2, 2024


*/s/ Bryan P. Tyson*
Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

*/s/ Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 9,119 words as counted by the word-processing system used to prepare the document.

/s/ *Bryan P. Tyson*
Bryan P. Tyson

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Bryan P. Tyson*
Bryan P. Tyson