No. 24-10230

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ALPHA PHI ALPHA FRATERNITY INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; JANICE STEWART,

*Plaintiffs-Appellants*,

*v.*

SECRETARY, STATE OF GEORGIA.

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of Georgia, No. 1:21-cv-5337 (Hon. Steve C. Jones)

## REPLY BRIEF FOR APPELLANTS

DEBO ADEGBILE
ROBERT BOONE
ALEX W. MILLER
CASSANDRA MITCHELL
ELIOT KIM
JUAN M. RUIZ TORO
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

CORY ISAACSON (Bar 983797)
CAITLIN F. MAY (Bar 602081)
ACLU FOUNDATION OF
  GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
Telephone: (678) 981-5295

ARI J. SAVITZKY
SOPHIA LIN LAKIN
MING CHEUNG
ACLU FOUNDATION
125 Broad Street
18th Floor
New York, NY 10004
Telephone: (212) 519-7836

*Counsel for Plaintiffs-Appellants Alpha Phi Alpha Fraternity, Inc. et al.*

September 23, 2024

ADDITIONAL COUNSEL ON INSIDE COVER

GEORGE P. VARGHESE
DENISE TSAI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

ANUJ DIXIT
MARISA A. DIGIUSEPPE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300

SONIKA R. DATA
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: (202) 663-6000

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1–26.1-3, Appellants *Alpha Phi Alpha, Inc., Sixth District of the African Methodist Episcopal Church, Eric T. Woods, Katie Bailey Glenn, Phil Brown, and Janice Stewart* identify all Counsel, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1.  ACLU Foundation, Inc., *Counsel for Plaintiffs-Appellants*;

2.  ACLU Foundation of Georgia, Inc., *Counsel for Plaintiffs-Appellants*;

3.  Adegbile, Debo P., *Counsel for Plaintiffs-Appellants*;

4.  Aiken, D'Ericka, *Counsel for Plaintiffs-Appellants*;

5.  Albert M. Pearson LLC, *Counsel for Amicus*;

6.  Allensworth, Robert M., *Attempted Amicus*;

7.  Alpha Phi Alpha, Inc., *Plaintiff-Appellant;*

8.  Arbuthnot, Jacqueline Faye, *Grant Plaintiff-Appellant*;

9.  Bokat-Lindell, Noah B., *Counsel for Intervenor*

10. Boone, Robert, *Counsel for Plaintiffs-Appellants*;

11. Bowles, Jasmine, *Amicus*;

12. Boyle Jr., Donald P., *Counsel for Defendant-Appellee*;

13. Brown, Phil, *Plaintiff-Appellant.*

14. Brown, Theron, *Grant Plaintiff-Appellant*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

15. Bush, Jacquelyn, *Grant Plaintiff-Appellant*;

16. Carr, Christopher, *Counsel for Defendant-Appellee*;

17. Calvo-Friedman, Jennesa, *Former Counsel for Plaintiffs-Appellants*;

18. Cheung, Ming, *Counsel for Plaintiffs-Appellants*;

19. Common Cause, *Amicus*;

20. Conner, Mary Nell, *Grant Plaintiff-Appellant*;

21. Crowell & Moring LLP, *Counsel for Amicus*;

22. Data, Sonika, *Counsel for Plaintiffs-Appellants*;

23. Davis, Alexander S., *Counsel for Amicus*;

24. Dechert LLP, *Counsel for Amicus*;

25. DiGiuseppe, Marisa A., *Counsel for Plaintiffs-Appellants*;

26. Dixit, Anuj, *Counsel for Plaintiffs-Appellants*;

27. Douglas, Maura,  *Counsel for Plaintiffs-Appellants*;

28. Draper, Paul R., *Former Counsel for Defendant-Appellee*;

29. Election Law Clinic at Harvard Law School, *Amicus*;

30. Elias Law Group LLP, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

31. Fair Districts GA, *Amicus*;

32. Flynn, Erin H., *Counsel for Intervenor*;

33. Ford, Christina Ashley, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

34. Freeman, Daniel J., *Counsel for Intervenor*;

35. GALEO Latino Community Development Fund, Inc., *Amicus*;

No. 24-10230
*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

36.   Garabadu, Rahul, *Former Counsel for Plaintiffs-Appellants*;

37.   Geaghan-Breiner, Charlotte, *Counsel for Plaintiffs-Appellants*;

38.   Genberg, Jack, *Counsel for Amicus*;

39.   Georgia Coalition for the People's Agenda, *Amicus*;

40.   Georgia Department of Law, *Counsel for Defendant-Appellee*;

41.   Georgia State Conference of the NAACP, *Amicus*;

42.   Glaze, Ojuan, *Pendergrass Plaintiff-Appellant*;

43.   Glenn, Katie Bailey, *Plaintiff-Appellant;*

44.   Grant, Annie Lois, *Grant Plaintiff-Appellant*;

45.   Graves, Cheryl, *Amicus*;

46.   Greenbaum, Jon, *Counsel for Amicus*;

47.   Greenwood, Ruth M., *Counsel for Amicus*;

48.   Harrison, Keith, *Counsel for Amicus*;

49.   Hawley, Jonathan Patrick, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

50.   Heard, Bradley E., *Counsel for Amicus*;

51.   Heaven, Astor H.L., *Counsel for Amicus*;

52.   Hennington, Elliott, *Pendergrass Plaintiff-Appellant*;

53.   Hessel, Daniel J., *Counsel for Amicus*;

54.   Houk, Julie M., *Counsel for Amicus*;

55.   Howell, Quentin T., *Grant Plaintiff-Appellant*;

56.   Isaacson, Cory, *Counsel for Plaintiffs-Appellants*;

57.   Ivey, Marvis McDaniel, *Amicus*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

58. Jacoutot, Bryan Francis, *Counsel for Defendant-Appellee*;

59. Jackson, Toni Michelle, *Counsel for Amicus*;

60. James, Triana Arnold, *Grant and Pendergrass Plaintiff-Appellant*;

61. Jamieson, Nathan, *Counsel for Amicus*;

62. Jones, Michael Brandon, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

63. Jones, Steve C., *District Court Judge*;

64. Kastorf Law LLP, *Counsel for Amicus*;

65. Kastorf, Kurt, *Counsel for Amicus*;

66. Khanna, Abha, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

67. Kim, Eliot, *Counsel for Plaintiffs-Appellants*;

68. Kim, Taeyoung, *Counsel for Plaintiffs-Appellants*;

69. Krevolin & Horst LLC, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

70. Lakin, Sophia Lin, *Counsel for Plaintiffs-Appellants*;

71. LaRoss, Diane Festin, *Counsel for Defendant-Appellee*;

72. Lawyers' Committee for Civil Rights Under Law, *Counsel for Amicus*;

73. League of Women Voters of Georgia, *Amicus*;

74. Lee, Theresa J., *Counsel for Amicus*;

75. Lewis, Joyce Gist, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

76. Love-Olivo, Cassandra Nicole, *Counsel for Amicus*;

77. May, Caitlin Felt, *Counsel for Plaintiffs-Appellants*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

78.  McGowan Charlene, *Former Counsel for Defendant-Appellee*;

79.  Miller, Alex W., *Counsel for Plaintiffs-Appellants*;

80.  Miller, Kelsey A., *Former Counsel for Plaintiffs-Appellants*;

81.  Mitchell, Cassie, *Counsel for Plaintiffs-Appellants*;

82.  O'Donnell, Courtney, *Counsel for Amicus*;

83.  Osher, Daniel C., *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

84.  Paradise, Loree Anne, *Former Counsel for Defendant-Appellee*;

85.  Pearson, Albert Matthews, *Counsel for Amicus*;

86.  Pendergrass, Coakley, *Pendergrass Plaintiff-Appellant*;

87.  Perkins Coie LLP, *Former Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

88.  Perkins, Brianne, *Amicus*;

89.  Petrany, Stephen J., *Counsel for Defendant-Appellee*;

90.  Raffensperger, Bradford J., *Defendant-Appellee*;

91.  Reynolds, Garrett, *Grant Plaintiff-Appellant*;

92.  Richards, Roberts, *Pendergrass Plaintiff-Appellant*;

93.  Rollins-Boyd, David, *Counsel for Amicus*;

94.  Rosenberg, Ezra D., *Counsel for Amicus*;

95.  Rueckert, Jens, *Pendergrass Plaintiff-Appellant*;

96.  Ruiz Toro, Juan M., *Counsel for Plaintiffs-Appellants*;

97.  Rutahindurwa, Makeba, *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

98.  Savitzky, Ari J., *Counsel for Plaintiffs-Appellants*;

No. 24-10230

*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

99.  Shaw, Abigail, *Former Counsel for Plaintiffs-Appellants*;

100. Sivaram, Anuradha, *Former Counsel for Plaintiffs-Appellants*;

101. Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellant;*

102. Solomon, Elbert, *Grant Plaintiff-Appellant*;

103. Southern Poverty Law Center, *Counsel for Amicus*;

104. Sparks, Adam M., *Counsel for Grant and Pendergrass Plaintiffs-Appellants*;

105. Smith, Casey Katharine, *Former Counsel for Plaintiffs-Appellants*;

106. Steiner, Neil, *Counsel for Amicus*;

107. Stewart, Janice, *Plaintiff-Appellant;*

108. Stewart, Michael Elliot; *Counsel for Intervenor*;

109. Strickland, Frank B., *Counsel for Defendant-Appellee*;

110. Sykes, Eunice, *Grant Plaintiff-Appellant*;

111. Taylor English Duma LLP, *Counsel for Defendant-Appellee*;

112. Thomas, Ursula, *Amicus*;

113. Tolbert, Elroy, *Grant Plaintiff-Appellant*;

114. Tsai, Denise, *Counsel for Plaintiffs-Appellants*;

115. Tyson, Bryan P., *Counsel for Defendant-Appellee*;

116. United States Department of Justice, *Intervenor*;

117. Varghese, George P., *Counsel for Plaintiffs-Appellants*;

118. Vaughan, Elizabeth Marie Wilson, *Former Counsel for Defendant-Appellee*;

119. Weigel, Daniel H., *Counsel for Defendant-Appellee*;

No. 24-10230
*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

120. Webb, Bryan K., *Counsel for Defendant-Appellee*;

121. Weitzman, Samuel, *Former Counsel for Plaintiffs-Appellants*;

122. Willard, Russell D., *Counsel for Defendant-Appellee*;

123. Williams, Ayana, *Former Counsel for Plaintiffs-Appellants*;

124. Williams, H. Benjamin, *Amicus*;

125. Williams, Edward, *Former Counsel for Plaintiffs-Appellants*;

126. Wilmer Cutler Pickering Hale and Dorr LLP, *Counsel for Plaintiffs-Appellants*;

127. Wimbish, Dexter, *Grant Plaintiff-Appellant*;

128. Woods, Eric T., *Plaintiff-Appellant;*

129. Young, Sean Jengwei, *Former Counsel for Plaintiffs-Appellants*;

130. Zabel, Joseph D., *Former Counsel for Plaintiffs-Appellants.*

No. 24-10230
*Alpha Phi Alpha Fraternity, Inc., et al. v. Secretary, State of Georgia*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Plaintiffs-Appellants state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS .....................................................C1

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ..................................................................................................1

ARGUMENT ..........................................................................................................3

I.    THE 2023 REMEDIAL PLANS PERPETUATE, RATHER THAN REMEDY,
      THE VOTE DILUTION PROVEN AT TRIAL ........................................................3

      A.    The 2023 Remedial Plans Do Not Create New Political
            Opportunities For Injured Voters In South Metro Atlanta...................3

      B.    The Secretary Badly Misrepresents Plaintiffs' Arguments.................7

      C.    The Secretary's Process Arguments Fail ...........................................15

II.   THE DISTRICT COURT ABUSED ITS DISCRETION IN APPROVING THE
      2023 REMEDIAL PLANS WHILE IGNORING DISPOSITIVE EVIDENCE ...............17

CONCLUSION ....................................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir. 1987)..........................2, 9, 16

*League of United Latin American Citizens v. Perry*,
  548 U.S. 399 (2006)........................................................................16

*Mississippi State Chapter, Operation PUSH v. Mabus*,
  932 F.2d 400 (5th Cir. 1991) .............................................................3

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................... 3, 6, 7, 10, 11, 12, 13, 15

*Swann v. Charlotte-Mecklenburg Board of Education*,
  402 U.S. 1 (1971).............................................................................3

*United States v. Dallas County Commission*,
  850 F.2d 1433 (11th Cir. 1988) .....................................................4, 14, 17, 19

*White v. Alabama*, 74 F.3d 1058 (11th Cir. 1996).....................................9

*Wright v. Sumter County Board of Elections & Registration*,
  979 F.3d 1282 (11th Cir. 2020) ...................................................18

## STATUTORY PROVISIONS

42 U.S.C. § 1973 ...........................................................................3

## OTHER AUTHORITIES

S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177 ...................10, 14

## INTRODUCTION

The Secretary's opposition rests on the faulty premise that the 2023 Remedial Plans "create two additional majority-black Senate districts and two additional majority-black House districts in the south metro Atlanta area." Opp. 16. The entire problem is that the State did *not* do that. Rather, as Plaintiffs' remedial stage submissions (which the Secretary never disputed and the district court ignored) demonstrated, nearly the entire net increase of Black voters in Black majority districts occurred in *North Metro Atlanta*, in areas that were not at issue in this case. In South Metro Atlanta, the State just shifted the district numbering around, putting new labels on old, already-existing Black-majority districts and leaving the old, vote-diluting White-majority districts virtually untouched.

The Secretary never disputes any of this. He primarily strains to make this case about "*political* preference," impugning Black Georgians who seek a full remedy for the vote dilution in South Metro Atlanta that was proven at trial as mere partisans. Opp. 19. But political party is irrelevant here. Plaintiffs are individual voters and non-partisan institutions whose interest is in Black voters having a full and fair opportunity to elect their preferred candidates, whatever their political affiliation. Plaintiffs proved that, under the old 2021 state legislative plans, Black voters in South Metro Atlanta are denied an equal opportunity to elect candidates of their choice to the State Senate and State House. Doc. 333 ("Merits Op.") at 480-

481.  To remedy that violation, more South Metro Atlanta Black voters necessarily needed to be included in Black-majority districts where they can elect candidates of choice.  But that did not happen.  Instead of implementing the necessary remedy, the State shuffled the district numbers around while leaving in place the same inequalities (indeed, in the Senate, almost the exact same district lines). That is a shell game, not a remedy.

The Secretary's brief nowhere disputes that the number of Black voters in Black-majority districts in South Metro Atlanta is essentially unchanged, or that nearly all of the Black voters who gained new political influence under the 2023 Remedial Plans live in areas of Georgia outside South Metro Atlanta where no vote dilution was alleged or proven.  That concession decides this appeal.  The rights guaranteed by Section 2 belong to individual voters, not a statewide minority group writ large.  And once a Section 2 violation has been found, a new plan must be put in place that will "*completely* remedy the Section 2 violation" and "*fully* provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice."  *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 250, 252-253 (11th Cir. 1987).  The remedial plans fail to do that.

Insisting that Black Georgians be able to participate in the political process and elect candidates of choice on equal terms is not "sour grapes."  Opp. 3.  It is what Section 2 requires.  The Court should reverse and remand.

## ARGUMENT

I.    THE 2023 REMEDIAL PLANS PERPETUATE, RATHER THAN REMEDY, THE VOTE DILUTION PROVEN AT TRIAL

### A.    The 2023 Remedial Plans Do Not Create New Political Opportunities For Injured Voters In South Metro Atlanta

The Secretary ignores the critical question presented: whether the 2023 Remedial Plans provide a remedy for the Section 2 violation in South Metro Atlanta that was proven at trial.

As in all equity cases, "the nature of the violation determines the scope of the remedy." *Mississippi State Ch., Operation PUSH v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991); *accord Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971). "If a § 2 violation is proved for a particular area, it flows from the fact that *individuals* in this area 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (emphasis added) (quoting 42 U.S.C. § 1973(b)). Because the right to an undiluted vote belongs to the "individual members" of a minority group and not to the group as a statewide whole, a remedy must address the "vote dilution injuries *suffered by these persons*" in order to comply with the Voting Rights Act. *Id.* (emphasis added). A remedy is inadequate if the Black voters whose votes were diluted "would still be suffering precisely the same injury that they suffered before [the misplaced remedial district] was drawn." *Id.*

Thus, to remedy a Section 2 violation, new opportunity districts must be added in the area where the injury was proven, and where the injured minority voters reside.

Here, it is Black voters *in South Metro Atlanta* whose rights were violated. That means relief that "completely remed[ies]" the harm must "fully provide[] equal opportunity" *to Black voters in South Metro Atlanta.  United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437-1438 (11th Cir. 1988).

The Secretary never even tries to explain how the 2023 Remedial Plans provide any new opportunities for Black voters in South Metro Atlanta.  He never disputes that the 2023 Remedial Senate Plan adds a net of just 3,000 South Metro Atlanta Black voters (one third of one percent of the population of a single Senate District) into Black-majority Senate districts, despite that area's Black population nearly quadrupling (from 74,249 to 294,914) since 2000.  *See* Doc. 356-3 at 1; Merits Op. 36-37.  Indeed, his own evidence proves that the number of Black voters residing in Black-majority Senate districts in South Metro Atlanta increases by just 0.4% under the 2023 Remedial Senate Plan.  Opp. 9 (citing Doc. 369-2, § 3.3).  The same story plays out across the 2023 Remedial House Plan, which likewise adds a paltry number of new Black voters into Black-majority districts in South Metro Atlanta, and many tens of thousands elsewhere.  *See, e.g.*, Doc. 354-1 ¶ 42; APA Br. 24-26.  He never disputes that the vast majority of Black voters who are moved into Black-majority districts under the 2023 Remedial Plans live in North Metro Atlanta—areas

like Cobb County and the northern parts of Fulton and Dekalb Counties that were not at issue in the case and for which no relief from any vote dilution harm is warranted.  Doc. 356-3 at 1; *see also* Doc. 356-7 at 3-4.  And he never disputes that it is this movement of Black voters in North Metro Atlanta that causes the claimed "increase" in the number of Black-majority districts in the 2023 Remedial Plans. *See* Doc. 354-1 ¶ 14.

On the crucial, dispositive question for this appeal—whether injured voters have been provided the relief that they are due by law—the Secretary offers nothing but the bare assertion that Remedial "Senate Districts 17 and 28, as well as House Districts 74 and 117, are new majority-black districts in the south metro Atlanta area."  Opp. 16; Opp. 23-26.  But calling these districts "new" because they have new numbers ignores the only relevant question: whether the districts in fact provide new political opportunities *for the voters in South Metro Atlanta who are owed a remedy for vote dilution*.  APA Br. 17-27, 38-42.

They do not.  All four districts are cobbled together from *existing* Black-majority districts, such that they create no new opportunities to elect candidates of choice for Black voters in South Metro Atlanta.  APA Br. 17-27, 38-42.  Remedial Senate District 17, for example, is formed by combining parts of two existing Black-majority districts.  As a result, approximately 80% of the Black voters in Remedial SD 17 already had the opportunity to elect candidates of their choice under the

previous map. *See* APA Br. 39; Doc. 356-7 at 2. And the small proportion of Black voters in Henry County who are newly added to a Black-majority district are then offset by the thousands of Black voters in neighboring Newton County who have been newly *removed* from a Black-majority district. APA Br. 5. Remedial Senate District 28 is likewise built from existing Black-majority districts, which are then combined with a section of Cobb County that is not in South Metro Atlanta and has nothing to do with Plaintiffs' claims in this case. *Id.*

Plaintiffs entirely agree that Section 2 "is concerned with *regions* and not particular *districts*." Opp. 29; *see Shaw*, 517 U.S. at 917. Here, the region at issue where unlawful vote dilution was proven is the five-county South Metro Atlanta region—made up of Fayette, Spalding, Rockdale, Henry, and Newton counties. APA Br. 5; Merits Op. 36-37, 480-481. The Remedial Senate Plan adds *zero* Black voters in Fayette, Spalding, or Rockdale counties to Black-majority districts. APA Br. 19. And while it adds 20,000 Black voters in Henry County to Black-majority Senate districts, it then offsets them by *removing* 17,000 Black voters in neighboring Newton County from Black-majority districts. *Id.* at 20. Again, this is Plaintiffs' *entire point*: In the *region* where vote dilution was claimed and established at trial, there has been essentially no increase in the number of Black voters residing in Black-majority districts, as would need to occur for South Metro Atlanta Black voters to gain new political opportunities despite racially polarized voting.

The remedial house districts in South Metro Atlanta are no different. They add only around 10,000 Black voters in Henry County to Black-majority House districts; leave the situation of Black voters in Spalding and Fayette counties unchanged; and *reduce* the number of Black voters in Black-majority districts in Newton County. Doc. 356-3 at 2. Applying the regional view that the Secretary agrees is correct, and focusing on the region that the District Court identified at trial, the 2023 Remedial Plans are not a complete remedy for vote dilution in South Metro Atlanta. Indeed, the 2023 Remedial Senate Plan is no remedy at all, and the 2023 Remedial House Plan is (at best) an incomplete one.

Because the 2023 Remedial Plans do not create any new political opportunities for South Metro Atlanta Black voters, those voters still "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Shaw*, 517 U.S. at 917. The 2023 Remedial Plans thus do not remedy the Section 2 violation at issue, which is why the remedy decision below must be reversed.

### B.    The Secretary Badly Misrepresents Plaintiffs' Arguments

Without any real response to Plaintiffs' central argument, most of the Secretary's opposition is given over to distortion after distortion of Plaintiffs' actual positions. These all fail.

- 7 -

As an initial matter, Plaintiffs never "insist[ed] that the State must confine its remedial districts to the vote dilution area identified in the court order."  Opp. 30; *see also id.* at 36 n.4 (stating that "the foundation of Plaintiffs' claim still appears to be that the State was not supposed to go outside of the challenged district lines").[1] Plaintiffs argued only that, whatever else the State did, it must remedy the vote dilution in South Metro Atlanta.  *See, e.g.*, Doc. 372 at Tr. 86:2-4 ("The problem is, it doesn't include a remedy.  They didn't do both things.  They didn't do both partisan goals and a remedy.  They just did one thing.").

Plaintiffs pointed to the set of districts identified by the Court in its liability opinion as one pertinent illustration of the area where the vote dilution harm had been proven.  But Plaintiffs continually insisted that above all, with respect to evaluating the efficacy of the remedy, the focus needed to be on South Metro Atlanta.  Doc. 372 at Tr. 72:13-16 ("[T]alk about the five counties we focused on at trial.  Either way, it's South Metro Atlanta.  That's where we're focused.  That's where the remedy needs to be."); *see also* Doc. 356-8; Doc. 356-36; Doc. 372 at 73:2-10, 83:4-9 (focusing extensively on number of voters added to the five South Metro Atlanta counties that were the focus at trial).  Because the injury was suffered

---

[1]    The district court similarly misapprehended Plaintiffs' argument.  Doc. 375 at 8 (calling "a foundational assumption of Plaintiffs' arguments" that "the State was confined to making changes only in those districts when creating the 2023 Remedial Plans").

by voters in that specific area, Plaintiffs insisted only that—whatever other changes were made in the course of crafting the remedial plans—those plans had to add new opportunities for Black voters to elect candidates of choice in South Metro Atlanta. *See, e.g.*, *Dillard v. Crenshaw County*, 831 F.2d 246, 250, 252-253 (11th Cir. 1987).

For similar reasons, the Secretary is also wrong that Plaintiffs seek "additional majority-*Democrat* districts," not the "additional *majority-minority* districts" that the district court's order required.  Opp. 39-40.  Plaintiffs have only ever argued that the 2023 Remedial Plans are insufficient because they do not cure the racial vote dilution proven at trial, and thus deny political opportunity to Black voters in South Metro Atlanta.  *See, e.g.*, APA Br. 30-31 ("The 2023 Remedial Plans did not remedy the Section 2 violation proven at trial."); Doc. 354 at 6.  Which party candidate South Metro Atlanta Black voters would elect if given a fair chance to elect candidates of choice is irrelevant—and the Secretary's stubborn insistence to the contrary is just the same kneejerk assumption "that Black people myopically vote the Democratic candidate" that the district court rejected based on the facts in the trial record.  Merits Op. 240.  Contrary to the Secretary's repeated attempts to reduce Black voters to just their party alignment, the rights guaranteed by Section 2 know no party label, and require "equal opportunity for minority citizens to participate and to elect candidates of their choice," whoever those candidates may be.  *White v. Alabama*, 74 F.3d 1058,

1069 n.36 (11th Cir. 1996) (quoting S. Rep. No. 97-417, at 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 208).

The Secretary next misrepresents Plaintiffs as arguing that this appeal involves the right of specific, individual voters "to be placed in a majority-minority district once a violation of the statute is shown," relying extensively on a footnote in *Shaw*.  Opp. 38-39 (citing *Shaw*, 517 U.S. at 917 n.9).  But Plaintiffs have never made that claim.  *See* APA Br. 35 & n.12.  The issue on this appeal is not whether any specific voter has a right to be placed in a majority-minority district, or whether Georgia left a few stray voters out in crafting new Black-majority opportunity districts in the area where they were required to remedy vote dilution.  The issue is that the State did not in fact draw new Black-majority districts in South Metro Atlanta *at all*—it rearranged and renumbered the existing Black-majority districts, such that effectively the same number of Black voters in South Metro Atlanta lived in Black-majority districts under the 2023 Remedial Plans as had lived in Black-majority districts under the unlawful 2021 Plans.

The numbers, which are undisputed and which both the Secretary and the district court ignored, prove this point beyond all doubt.  The ideal population of two State Senate districts (the number of new Black-majority districts the State was required to draw to remedy vote dilution) is about 380,000 people.  Merits Op. 348.  The ideal population of two State House districts is about 120,000 people.  *Id.* at

359.  The Remedial Senate Plan adds only 3,000 Black voters in South Metro Atlanta to Black-majority districts and the Remedial House Plan adds only 15,747.  APA Br. 21, 24.  Neither figure represents the addition of a meaningful number of Black voters in South Metro Atlanta to Black-majority districts, nor comes close to permitting the creation of *two* new Black-majority districts in South Metro Atlanta. The Senate number is so low it is effectively zero (0.4%, to be exact).  So while there may be hard cases that require courts to probe the line of just how many voters may be left by the wayside when crafting a remedy, this case is not one of them.  Opp. 36-38 (suggesting such cases and positing that Section 2 allows "some voters in the vote dilution area who were previously in majority-white districts [to] remain in majority-white districts").  Here, the entire area where vote dilution was proven at trial was left by the wayside, while new opportunities for Black voters were added in an entirely different area.

The Secretary further errs in claiming that Plaintiffs have asserted that *Shaw* "requires States to remedy vote dilution by adjusting the particular electoral districts identified by the district court."  Opp. 30; *compare supra* at 10.  Plaintiffs have (again) made no such argument, because *Shaw* says no such thing.  Plaintiffs simply point out that *Shaw* held that "it is the minority voters *in the area where dilution has been shown* whose interests matter for purposes of the remedy—not minority voters as a whole, or minority voters elsewhere in the state."  APA Br. 34 (discussing *Shaw*,

517 U.S. at 917). *Shaw* could not be clearer on this point, repeatedly stating that the relevant frame for evaluating Section 2 claims and remedies is the "particular area[s]" where "individuals" have suffered a vote-dilution injury. *Shaw*, 517 U.S. at 917. Here that area is South Metro Atlanta.

The Secretary's other efforts to distinguish *Shaw* are even further off the mark. While *Shaw* involved a racial gerrymandering claim, the Court expressly evaluated the requirements for Section 2 remedies because that was the basis for North Carolina's defense. 517 U.S. at 917. *Shaw* thus speaks to the requirements of Section 2, as the Secretary ultimately concedes. *Id.*; *see also* Opp. 31 (so conceding). It is irrelevant that the remedial district at issue in *Shaw* was not sufficiently compact, Opp. 31; as the Court held, even a compact remedial district still would not have been an adequate remedy because "[t]he vote-dilution injuries suffered" by voters in one area simply are "not remedied by creating a safe majority-black district somewhere else in the State." *Shaw*, 517 U.S. at 917. The Secretary's last refuge is to suggest (at 31-33) that the remedial district in *Shaw* was more geographically distant from the asserted vote-dilution injuries in North Carolina than the new North Metro Atlanta Black-majority districts in the 2023 Remedial Plans are from South

Metro Atlanta. That is not actually true.[2] But even if it were, the Secretary misses the point. North Metro Atlanta is not South Metro Atlanta. The Supreme Court's explication of what Section 2 requires—a remedy for the harms suffered by voters in the "particular area" at issue and not "somewhere else in the State," *Shaw*, 517 U.S. at 917—applies here with full force.[3]

Perhaps the Secretary's most glaring distortion is the assertion that "Plaintiffs here, unlike in *Dallas County*, do not argue that the remedial maps adopted by the Georgia legislature continue to dilute minority votes." Opp. 34. *That is exactly what Plaintiffs are arguing and have been arguing*: The 2023 Remedial Plans failed to remedy vote dilution in South Metro Atlanta and instead perpetuate that vote dilution. That is what Plaintiffs argued in their opening brief. *See, e.g.*, APA Br. 44, 47, 49 (arguing that "the 2023 Remedial Plans perpetuated the same vote dilution

---

[2]     Indeed, in *Shaw* 20 percent of the challenged district was in Mecklenburg County, where the vote dilution the State claimed warranted an additional Black-majority district was occurring. But even that was not enough to be a valid remedial district; rather, the Court did "not think that *this degree of incorporation* could mean that District 12 substantially addresses the § 2 violation." *Shaw*, 517 U.S. at 918 (emphasis added). Here, the remedial effects felt in the South Metro Area are more remote, especially in the Senate.

[3]     Notably, the population of the Atlanta metro area in 2020 was nearly the same as North Carolina's statewide population at the time of the litigation leading to *Shaw*. That only heightens the similarity between the incomplete relief; just as vote dilution injuries could not be remedied "somewhere else in [North Carolina]," the vote dilution injuries here cannot be remedied "somewhere else in [Atlanta]." *Shaw*, 517 U.S. at 917.

in South Metro Atlanta that was proven at trial" and that "South Metro Atlanta Black voters continue to have their votes diluted"). That is what Plaintiffs argued below. *E.g.*, Doc. 354 at 2 ("The 2023 Proposed Plans fail to address the vote dilution found by this Court after trial. They instead perpetuate it."), 16-17, 19; *see also* Doc. 370 at 1-2 (similar). The Secretary's suggestion (at Opp. 35-36 & n.4) that Plaintiffs somehow forfeited the position they have repeatedly and explicitly taken throughout the remedial proceedings in this case only demonstrates his profound commitment to avoiding the central issue in this appeal.[4]

The Secretary's contention that "Plaintiffs have not offered any alternative remedial plans with more majority-black districts in the vote dilution areas" is likewise baseless. Opp. 34. Plaintiffs did *exactly that*. Plaintiffs submitted proposed redistricting plans along with their objections to the remedial plans. APA Br. 27; *see also* Doc. 354-1. These proposed remedial plans showed that a complete remedy *was* possible, because new Black-majority districts could be drawn in the areas

---

[4] The Secretary's attempts to distinguish *Dallas County* fail as well. It is true that *Dallas County* involved a challenge to at-large elections (Opp. 33) but that fact is irrelevant to the court's holding that, at the remedial phase, "election plans" enacted by the State to fix a Section 2 violation must "'completely remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice.'" *Dallas County*, 850 F.2d at 1437-1438. The underlying Senate Report on which the court relied likewise concerned Section 2 remedies generally, rather than at-large elections. *See* S. Rep. No. 97-417, at 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 208 (quoted in *Dallas County*, 850 F.2d at 1438).

where vote dilution was proven at trial. APA. Br. 27, 48; Doc. 354-1 at 8-12, 16-19; Doc. 356-1; Doc. 356-3; Doc. 356-10; Doc. 356-36. In these proposed remedial plans, many tens of thousands of Black voters in the five-county South Metro Atlanta area are added to newly Black-majority districts. *See* Doc. 356-3 at 3-4. Plaintiffs thus very much *did* offer "alternative remedial plans with more majority-black districts in the vote dilution areas." Opp. 34. In contrast, the 2023 Remedial Plans do not contain any such additional South Metro Atlanta majority-Black districts. They instead include only the same districts, renumbered—which is why they are an impermissible, faulty remedy. *See, e.g.*, APA Br. 17-27; Doc. 370 at 1-8; *see also supra* at 4-7.

## C.    The Secretary's Process Arguments Fail

The Secretary also offers two process-related arguments, neither of which has any merit.

*First*, the Secretary devotes considerable attention to the generalized and unremarkable proposition that legislatures have flexibility and discretion in drawing "the precise boundaries" of remedial districts. Opp. 2-3, 14-15, 20-23, 40-41. But Plaintiffs have never disputed the existence of "broad discretion in drawing districts to comply with the mandate of § 2." *Shaw*, 517 U.S. at 917 n.9; *see, e.g.*, APA Br. 36-37. This discretion, however, only applies to the extent that the legislature draws remedial plans that "comply with the mandate of § 2." *Shaw*, 517 U.S. at 917 n.9.

And such discretion "has limits," namely the fundamental duty to remedy Section 2 violations. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).

In other words:  the discretion to fashion a remedy that eliminates vote dilution is part and parcel of the State's *obligation* to fashion a remedy that eliminates vote dilution.  This appeal is not about whether it was permissible for the legislature to choose one Section-2-compliant remedial plan over another.  It is about whether the plan chosen, which does not alter the political opportunities for Black voters in South Metro Atlanta where vote dilution was proven, complies with Section 2 in the first place.  "It is clear that any proposal to remedy a Section 2 violation must itself conform with Section 2." *Dillard*, 831 F.2d at 249.  Here, the legislature selected a "remedial plan" that left the South Metro Atlanta area essentially untouched, especially as to the State Senate. *See supra* at 4-7; APA Br. 21-27.  The South Metro Atlanta Senate Districts that Plaintiffs challenged and that were held to violate Section 2, 2021 SD 16 and SD 17, are still there, only renumbered (and in the case of SD 17, with minor tweaks around the edges). *See* APA Br. 38-41.  A remedial plan that effectively re-imposes lines already held to violate Section 2 is not a plan that "itself conform[s] with Section 2." *Dillard*, 831 F.2d at 249.

*Second*, the Secretary halfheartedly challenges this Court's appellate jurisdiction, suggesting that Plaintiffs should have appealed the Court's *liability* decision if it wanted to "impose[] stricter limits" on the remedial process. Opp. 41-

42. But, again, Plaintiffs do not argue for any "limits" on the remedial process other than those provided by federal law—namely that any remedial map must provide a complete remedy for vote dilution, which is exactly what the district court ordered in its initial decision, Merits Op. 509. *E.g.*, *Dallas County*, 850 F.2d at 1437-1438. In addition to misstating Plaintiffs' argument, the Secretary's suggested approach violates basic principles of appellate procedure: It would require a litigant to appeal a liability decision they agree with and front-run a remedy process that hasn't happened yet, rather than simply wait for the remedial phase to conclude with an appealable order.

The issue in this appeal is and always had been whether the district court, having properly ordered a complete remedy, "erred in approving remedial maps that did not provide any additional opportunities to elect candidates of choice for Black voters in those specific geographic areas." APA Br. 1. The approval of remedial plans that provide no relief for Black voters in South Metro Atlanta was error.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN APPROVING THE 2023 REMEDIAL PLANS WHILE IGNORING DISPOSITIVE EVIDENCE

This Court can and should reverse because the district court misapplied binding Supreme Court and Eleventh Circuit precedent in accepting remedial plans that fail to completely and fully remedy the vote dilution in South Metro Atlanta proven at trial. But even setting that legal error aside, the district court also abused its discretion by failing at the remedial stage to engage in a "meaningful evaluation

of all the relevant evidence." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301-1302 (11th Cir. 2020).

Nothing in the opposition is to the contrary. As explained, the remedial inquiry turns on the voters who have suffered vote dilution. *Supra* at 3-4, 11-13. The district court failed to consider the extensive evidence of the effect of the 2023 Remedial Plans on Black voters in South Metro Atlanta presented by Plaintiffs at the remedial hearing, which showed that almost no Black voters in South Metro Atlanta had been added to Black-majority districts. Instead, the court accepted the Secretary's new-district-numbers-only approach. *Supra* at 5-7; APA Br. 43-47. This is not a question of whether another district court "might have reached a different decision," Opp. 43-44, but rather what decision was compelled by the undisputed evidence in the record, APA Br. 46. Here, the evidence as to the effects of the 2023 Remedial Plans on Black voters in South Metro Atlanta was extensive and undisputed, yet the district court did not address it. Merely citing the relevant legal standard—which, as already explained, the court then misapplied—does not constitute the type of "meaningful evaluation" of the evidence this Court requires. *Wright*, 979 F.3d at 1301-1302. Yet that is all the Secretary points to with respect to the district court's "consideration[]" of the evidence. Opp. 42-43.

The Secretary offers no defense at all for the district court's failure to address the proposed remedial plans submitted by the Plaintiffs. Those plans were highly

relevant because they demonstrated the possibility of creating the additional opportunities for Black voters in South Metro Atlanta the district court ordered. *See* Doc. 354-1; Doc. 356-3 at 3 (Plaintiffs' Remedial Illustrative Senate Plan added 88,035 Black voters in the vote-dilution area to Black-majority districts, compared to the 2023 Remedial Senate Plan's 2,940); Doc. 356-3 at 4 (Plaintiffs' Remedial Illustrative House Plan added 25,652 Black voters in South Metro Atlanta to Black-majority districts, compared to the 2023 Remedial House Plan's 15,747). Plaintiffs' proposed remedial plans were thus important evidence as to why the 2023 Remedial Plans had failed to correct the vote dilution proven at trial. They needed to be considered as such.[5]

As already explained, it is no response to say that "it is up [to] the legislature to determine exactly *how* and *where* to create" remedial districts. Opp. 44. At all times, including at the remedial stage, the courts must ultimately ensure an "equal opportunity for minority citizens to participate and to elect candidates of their choice." *Dallas County*, 850 F.2d at 1438. The district court's approval of the

---

[5]     Here too, the Secretary evades Plaintiffs' actual arguments. Plaintiffs' Remedial Plans were not part of a "beauty contest" meant to show that the State's 2023 Remedial Plans were not the best available remedy. Opp. 37. Rather, Plaintiffs' Remedial Plans well illustrated that the State's decision to leave the vote dilution in South Metro Atlanta virtually untouched was a choice—and that the State could have fully complied with traditional districting principles while fashioning a real remedy. Because the district court likewise ignored the probative value of Plaintiffs' Remedial Plans and dismissed them as irrelevant on similar "beauty contest" grounds (Doc. 375 at 14), it erred here as well.

remedy here did not meet that standard, and its failure to consider key evidence demonstrating the insufficiency of the 2023 Remedial Plans was an abuse of discretion.

## CONCLUSION

The Court should reverse or vacate the district court's December 28, 2023 order, and remand with instructions that the district court appoint a special master or adopt any other lawful remedial plans.

Respectfully submitted.

/s/ *Ari J. Savitzky*

| | |
|---|---|
| Ari J. Savitzky | Debo Adegbile |
| Sophia Lin Lakin | Robert Boone |
| Ming Cheung | Alex W. Miller |
| ACLU FOUNDATION | Cassandra Mitchell |
| 125 Broad Street, 18th Floor | Eliot Kim |
| New York, New York 10004 | Juan M. Ruiz Toro |
| Telephone: (212) 519-7836 | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 250 Greenwich Street |
| Cory Isaacson (Bar 983797) | New York, New York 10007 |
| Caitlin F. May (Bar 602081) | Telephone: (212) 230-8800 |
| ACLU FOUNDATION OF GEORGIA, INC. | |
| P.O. Box 570738 | George P. Varghese |
| Atlanta, Georgia 30357 | Denise Tsai |
| Telephone: (678) 981-5295 | WILMER CUTLER PICKERING HALE AND DORR LLP |
| | 60 State Street |
| Sonika R. Data | Boston, Massachusetts 02109 |
| WILMER CUTLER PICKERING HALE AND DORR LLP | Telephone: (617) 526-6000 |
| 2100 Pennsylvania Ave. NW | |
| Washington, D.C. 20037 | |
| Telephone: (202) 663-6000 | |
| Facsimile: (202) 663-6363 | |
| | |
| Anuj Dixit | |
| Marisa A. DiGiuseppe | |
| WILMER CUTLER PICKERING HALE AND DORR LLP | |
| 350 South Grand Avenue | |
| Los Angeles, CA 90071 | *Counsel for Appellants* |
| Telephone: (213) 443-5300 | |

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,947 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font in text and footnotes.

/s/ *Ari Savitzky*
Ari Savitzky

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system, which will automatically send a notice of the electronic filing to all registered CM/ECF users who have entered an appearance in the case.

This 23rd day of September, 2024.

/s/ *Ari Savitzky*
Ari Savitzky